**BAER BROS. LAND & CATTLE CO. v. REED et al.**

No. 4384.

United States Court of Appeals
Tenth Circuit.

May 31, 1952.

Rehearing Denied June 30, 1952.

Albert T. Frantz, Denver, Colo., for appellant.

Lowell White, Denver, Colo. (Walter A. Steele, Denver, Colo., was with him on the brief), for appellees.

Before BRATTON, MURRAH and PICKETT, Circuit Judges.

MURRAH, Circuit Judge.

This action was instituted in the United States District Court of Colorado by appellees, N. H. Reed and W. A. Devenport,

against appellant, The Baer Brothers Land and Cattle Company, to recover the balance due on the purchase price of cattle delivered by appellees to appellant under the terms of a written contract. After trial to a jury, in which voluminous and sharply conflicting evidence was adduced, the jury returned a verdict for the full amount prayed for by appellees, plus interest. This appeal is from a judgment on that verdict. Although numerous specifications of error are assigned on appeal, we think they may be fairly epitomized as embodying the contention that under the evidence, the trial court should have directed a verdict for appellant. Our precise question, therefore, is whether there was any competent evidence to support the verdict of the jury.

Appellees, Reed and Devenport, both residents of the State of Texas, are partners in the cattle business in that State. Appellant is incorporated under the laws of the State of Colorado, and S. M. James is its President. Devenport and James met for the first time on June 28, 1948, in Amarillo, Texas. After showing James some cattle he was selling to other parties, Devenport accompanied James to the ranch of the Cattle Company at Meeker, Colorado, and as a result of negotiations, the contract involved here was executed at the ranch. The contract, dated July 3, 1948, between Devenport as seller and James as buyer "covers the sale of the following described livestock, for the consideration of the sum of $10,000.00 part payment, the receipt of which is hereby acknowledged by the seller; balance of purchase price to be paid upon completion of contract. Number — 500; Description — Yearling Hereford Steers (weighing approximately 450 lbs. each, more or less); Branded— Left hip; Price—28¢ lb." It was further provided that "these cattle are now located on Reed & Devenport Ranches, Big Spring, Texas and are to remain on Ranches of Reed & Devenport until delivered. Delivery to be made on or before July 17, 1948, at the buyer's option at K-T Ranch, Meeker, Colorado, F.O.B. cars, Big Spring, Texas, and to be weighed as follows: when loaded stockyards weights less 3%. All cattle are to be sound and in merchantable condition,

and free from any contagious disease. Crippled, deformed, blind-eyed, locoed, lump-jawed, or otherwise deformed animals may be rejected by the buyer. Health and brand certificates to be furnished by the seller. All cattle are to be delivered free of all encumbrances and with a clear title except unpaid balance of purchase price which will be due and payable when cattle are sold by buyer on or before December 15, 1948, with interest at 5% per annum payable at maturity. Buyer to pay R. R. freight to Rifle, Colorado, and pasture cattle on K-T Ranch."

In accordance with the terms of the contract, the Cattle Company paid Reed and Devenport $10,000.00, and thereafter three shipments of cattle were made by appellees to the Cattle Company. The first, consisting of 142 head of steers, arrived at Rifle, Colorado, on July 17, 1948; the second of 309 head arrived on July 21; and the third of 49 head arrived about August 10.

When the Cattle Company failed to pay the balance due under the contract, appellees brought this suit for $59,872.00 and interest at the rate of 5 per cent before maturity and 6 per cent thereafter. In its answer, the Cattle Company denied that it was a party to the contract, contending that it was entered into by James individually. In the alternative, it counterclaimed for the sum of $37,405.03 for the alleged breach of the contract in the following respects: the cattle were not all delivered on or before July 21, 1948; the cattle were not weighed at Big Spring, Texas; the submitted weights were false, fraudulent and fictitious; and ten head of cattle were so weak and diseased when delivered that they died within a few days.

Appellant has abandoned its contention that James executed the contract in his own behalf and not in his capacity as President of the Cattle Company. The points relied upon for reversal are aimed principally at the sufficiency of the evidence to establish the contract weights and grade of the cattle.

Devenport testified that the first two shipments, consisting of 451 head of steers, were weighed at the Taylor Country Live-

stock Auction Company, Abilene, Texas; that he stood behind the weigher, observed the weights and saw the weigher put them on the weight slips. He stated that he also counted the number of cattle in each lot weighed and saw the weigher enter that number on the slips; that he knew the number of cattle and total weights appearing on the slips were accurate. Devenport further testified that Charlie Morris was the owner of the Auction Company at Abilene where the cattle were weighed; that Morris weighed part of the cattle and other parties working there weighed some, but that the name "Morris" was written on all of the slips because he was the owner. Having been thus identified, the weight slips were offered and admitted in evidence.

Two depositions of Morris were read to the jury. In his first deposition, Morris stated that he did no public weighing and had no experience or training in that line; that he did not weigh any cattle for Reed and Devenport in July, 1948; that the slips shown to him were not made or signed by him; that the cattle were weighed at another auction company; that he had knowledge of the cattle involved because he helped load the shipment for Reed and Devenport to Rifle, Colorado, via The Texas & Pacific R. R. Company.

In a later deposition, Morris identified the weight slips and stated that they were "scale ticket weights of cattle brought to the Taylor Auction and asked to be weighed by Mr. Reed and Mr. Devenport"; that he weighed part of them and the rest were weighed by other persons working there; that the scales were checked by the State and had a State seal on them; and that the weights and number of cattle shown on the slips were correct and accurate. When asked what kind of cattle he weighed, that is "Hereford or mixed," he replied that they were "Hereford"; and that he knew these cattle were taken to the Railroad and consigned to Rifle, Colorado.

Morris made a feeble attempt to explain his irreconcilable depositions by a statement at the end of his second deposition that "I wish to state that in the former deposition given by me, I thought the questions were referring to cattle I had bought and sold to Reed and Devenport and not to cattle that they had brought in to be weighed before shipped."

Appellant strenuously objected to the introduction of the weight slips in evidence on the ground that the best evidence of the weight of the cattle would be the testimony of the person or persons who actually weighed them; and, in view of the sharply conflicting depositions of Morris, the slips which showed his signature should not have been admitted as evidence of the correct weights unless he was present at the trial for cross-examination. When the trial court admitted the weight slips in evidence, it was careful to point out to the jury that they were not conclusive proof of the weights, but were to be considered only with all of the other evidence in arriving at the true weights. We agree with the trial court that the weight slips were properly admitted in evidence, and that their probative value was for the jury. Admittedly, Earl Rogers weighed the third shipment of cattle, consisting of 49 head, at Post, Texas, and by deposition identified the weight slips prepared by him. There can be no doubt of the admissibility of this bit of evidence or the weight and value to be given to it.

The first two shipments of cattle were weighed by the Railroad upon arrival at Rifle, Colorado, and those weight slips reflect a shrinkage of 11 per cent of the total weights shown by the weight tickets made at Abilene before shipment. The third shipment was not weighed upon arrival at Rifle. Appellant says that this shrinkage is excessive and is proof that the Abilene weights are incorrect. Devenport testified that he told James they could expect a shrinkage of 10 to 16 per cent on a haul of that distance, and Morris stated in his deposition that the ordinary shrinkage for that distance would be 10 to 12 per cent.

James testified that only about 10 per cent of the cattle were top grade Hereford, and the balance were of mixed breed worth about 14¢ to 18¢ per pound, instead of 28¢ as provided in the contract. Appellant attempted to prove the poor grade and quality of the cattle by expert witnesses

who stated that they were worth less than the agreed price; and that they would be classed as "mixed breed" and not "Hereford." James stated that it was understood that the cattle were to be as good as those he saw while in Amarillo—Devenport testified that the cattle shipped were better than those shown to James. J. H. Hicks, who qualified as an expert witness, testified that he inspected the cattle for a Denver bank in September, 1948, and that they were worth around 24¢ to 30¢ per pound at that time; that they would be classed as "Hereford" and not "mixed breed" and were of "medium class." In their depositions, both Morris and Rogers stated that the cattle weighed by them were "Hereford."

Appellant complains that in violation of the terms of the contract that the cattle were to weigh "450 pounds more or less," the cattle shipped were of the average weight of 511 pounds according to the weight slips submitted to it. It is manifest from the contract and common knowledge that the parties did not have in mind an exact weight, and the variance between 450 pounds and 511 pounds would be within the latitude of "more or less."

It is further contended that the contract was breached because the cattle were not shipped from Big Spring, Texas, and were not delivered on or before July 17, 1948. Devenport testified that the reason the cattle were shipped from Abilene was that it was a shorter railroad haul from that point to Rifle, and Abilene had better stockyard facilities; that the third shipment was from Post, Texas, because they hoped to get that carload of cattle on the same train with some sheep that were being shipped to appellant at Rifle. No damages were shown to have resulted by reason of shipping the cattle from points other than provided in the contract, or by the delay in the last two shipments.

James testified that he was not satisfied with the grade of the cattle when they arrived and made objections to an employee of appellees who accompanied the cattle and also later to Devenport; that Devenport promised him they would make it right with him and adjust things, but that when nothing was done, he tendered part of the cattle back to appellees in October, 1948. Devenport testified that he was at the ranch of the Cattle Company off and on from about August 10, when the last shipment arrived, until the latter part of September; that during this period he saw James nearly every day and he never complained about the quality of the cattle. Appellees both stated that they learned for the first time that James was dissatisfied with the cattle in October, 1948, at which time "there was a decline in the cattle market." Thoughout the trial, James reiterated that he did not accept the cattle as fulfilling the terms of the contract, but only to secure the $10,000.00 paid on the purchase price, and reliance upon the assurance of appellees that they would make adjustments on account of the grade of the cattle. In this connection, appellees point to the fact that at the reduced price appellant claims the cattle were worth at the time of delivery, the 142 head in the first shipment were worth more than $10,000.00; that there was no reason to accept the other two shipments and thus increase the loss if the cattle were of a poorer quality than contracted for.

The testimony of James to the effect that he expressed dissatisfaction with the grade of the cattle upon their arrival, and that damages were suffered by reason of the delay in the last two shipments, is wholly inconsistent with the undisputed facts separate and apart from the conflicting testimony, and certainly raised questions of fact to be resolved by the jury. Indeed, after the second shipment, at the request of James, an employee of the Railroad wired Devenport that "All cattle in shipment last week were found well except three dead." (The Cattle Company was later compensated for this loss by the Railroad.) And, shortly after the second shipment was received, James wired for the balance of 49 head of cattle, stating that if they could not furnish steers "we would consider heifers at an agreed price." Health certificates on the cattle were furnished to appellant by the Railroad.

It is true that appellees did not strictly comply with the terms of the con-

tract in several respects, but appellant accepted delivery of the cattle with knowledge of the fact that they were not shipped from Big Spring, that two shipments were late, and that the average weight was in excess of 450 pounds. Being in possession of the cattle, appellant was afforded an opportunity to inspect them as to breed, quality and other respects in the light of the terms of the contract, but there is no specific proof that formal protest was made before October, 1948, approximately three months after delivery. When all of the grievances are considered, separately and together, they present no more than technical variances from the letter of the contract, and courts will not deny enforcement in the face of a showing of substantial performance and in the absence of a detriment. Williston Contracts, Rev. Ed., Vol. 3, Sec. 805. Implicit in the jury's verdict is a finding of substantial performance of the contract. That finding is supported by competent evidence and it has binding effect here.

On several occasions during the trial of the case, appellant sought to in introduce evidence of an existing mortgage on the cattle at the time of delivery contrary to the terms of the contract. The court sustained appellees' objection to this evidence on the ground that no mention of a mortgage was incorporated in any of the pleadings; and since, by appellant's own admission, it had this knowledge at the time the suit was filed, the issue should not be injected for the first time "in the middle of trial." While proof that the cattle were mortgaged might have been within the issues, whether pleaded or not, there was no showing or offer to show that appellant was damaged in any way by an existing mortgage, and the case should not be reversed in the absence of a showing that failure to admit proof in any way prejudiced the appellant's cause.

Finally, it is contended that the court improperly allowed interest on the judgment. It is argued that since the contract was breached in many respects, after which an adjustment was attempted between the parties, there was joint control and possession of the cattle during that period. Chapter 88, Section 2, 1935 Colorado Stat. Annot. provides: "Creditors shall be allowed to receive interest, when there is no agreement as to the rate thereof, at the rate of six per cent per annum, for all moneys after they become due, on any bill, bond, promissory note or other instrument of writing * * * on money due on account from the date when the same became due * * *." The verdict of the jury for the full amount due under the contract is tantamount to a determination that appellees substantially complied with the terms of the contract, and that the sums provided therein became due and payable according to its tenor. This being so, they were entitled to statutory interest after maturity.

The judgment is affirmed.