The REGENTS OF the UNIVERSITY OF COLORADO, a body corporate, Plaintiff-Appellee,

v.

K.D.I. PRECISION PRODUCTS, INC., a Delaware corporation, Defendant-Appellant.

No. 72–1892.

United States Court of Appeals, Tenth Circuit.

Aug. 14, 1973.

Decided Dec. 3, 1973.

Rehearing Denied Dec. 27, 1973.

Harlan C. Stientjes, Greeley, Colo., for plaintiff-appellee.

Thomas T. Crumpacker, Aspen, Colo., for defendant-appellant.

Before HILL and SETH, Circuit Judges, and TALBOT SMITH.*

TALBOT SMITH, Senior District Judge.

This case involves the construction and interpretation of a research and development contract entered into between the Regents of the University of Colorado (hereafter University) on the one hand and K.D.I. Precision Products, Inc., a Delaware corporation (hereafter KDI or Precision Products) and its parent corporation, K.D.I. Corporation, a Delaware corporation (hereafter, jointly,

---

* Hon. Talbot Smith, United States Senior District Judge, Eastern District of Michigan, sitting by designation.

the Sponsors).[1] A jury trial resulted in a verdict in favor of the University for work and services performed in the amount of $195,000.

The research and development contract before us consists of two basic documents: a three page "Memorandum Agreement" and a seventeen page "Proposal" entitled "Semiconductor Studies in Ion Implantation". This Proposal, incorporated into and made a part of the Memorandum Agreement, itself incorporated two attached exhibits: a "Patent Agreement" which the University agreed to obtain from its employees who worked on the contract, and a "Three-Year Budget" specifying the University's budget limitations.

Under the terms of the contract it was the obligation of the University, in return for stated financial remuneration, to undertake a Proposed Research Program for the sponsors. This program related to ion implantation equipment, a liquid electrostatic high-voltage generator, a heavy mass linear accelerator and separator, general heavy mass accelerator studies, and a real time recording monochromator, as well as additional research in six other categories. The type of research to be undertaken may be partially exemplified by the provisions relating to the last-mentioned project, the real time recording monochromator, which will be found in the margin hereof.[2] In addition the contract

contained detailed provisions concerning the reports to be submitted, the budget limitations to be observed, and, under the general contract heading "Patent Right", the rights granted KDI, particularly the University's agreement to transfer to the sponsors the entire right, title and interest in each invention conceived or reduced to practice in the course of the program.

The contract, which was for a three year period, was terminated by the sponsors at the end of the first contract year, because of the corporation's serious financial problems. The letter of cancellation thanked "the University of Colorado and the people involved for the excellence of the research program conducted on our behalf over the past four years" and stated, as well, that if economic conditions changed sufficiently prior to the completion of the program, KDI would reconsider its level of support. Sixty days notice of termination was given (letter dated August 31, 1970), and, in order "To accomplish a more gradual phasing of the program and to allow some continuity of work, we would propose to spread the $55,556 [a prorated portion of the allotted budget] over the full academic year." [3]

The litigation before us concerns the rights and obligations of the parties upon termination. The University claimed that it was unpaid for its work under the contract and brought action

1. Proceedings against K.D.I. Corporation were stayed by the United States District Court for the Southern District of Ohio, Western Division, in Bankruptcy, Case No. 61463.

2. "5. Real Time Recording Monochromator
The program in this area of study is to: a) Develop an infrared version of the present monochromator; b) Improve the signal-to-noise ratio of the vidicon system to enhance sensitivity; c) Evaluate the probable success in developing a UV model and far infrared model of the present instrument; and d) Evaluate the limit in resolution and sensitivity and wave-length range that an ultimate system could be expected to achieve.
The IR development requires the use of an infrared vidicon which is presently available

with reasonable sensitivity to 1.5 microns. Signal-to-noise ratio enhancement will be accomplished by frequency shifting the information detected by the vidicon from base band to 455 kc. This can be accomplished with a ronchi ruling and reversing the fast and slow sweeps. In this manner a vertical line is swept rapidly recovering information from within the wavelength resolution of the vidicon. Since the ronchi ruling is selected to chop this information so that it is swept at a frequency of 455 kc for a vertical illuminated line the output signal of the vidicon will have a carrier frequency of 455 kc. Preliminary tests indicate that this method will be useful in eliminating the major component of noise in the vidicon (1/f noise)."
App. Vol. II, pp. 322–323.

3. App. Vol. II, Exhibit C, pp. 334–335.

for the amount due according to its reckoning. In defense Precision Products asserted shortcomings in the University's performance, and, in addition, asserted setoffs arising from the University's alleged overdraft in its account and its "conversion" of "the technical data, scientific know-how, materials, equipment, and other products of the research." The errors asserted on appeal cover a broad front, including the issues of substantial performance by the University, the ownership of the various pieces of equipment and machines involved in the project, and the computation of damages.

■ We will first consider the assertion going to the root of the University's right to recover for its work done, namely, the charge that it failed to perform substantially its duties under the contract. 3A Corbin on Contracts § 660, pp. 164–165, Reynolds v. Armstead, 166 Colo. 372, 443 P.2d 990 (1968). In this area we find three principal charges of error, the first relating to the technical data under the programs. KDI asserts that the contract gave it exclusive rights to such data, which rights were not accorded it by the University. The contract, however, does not support this claim. The rights of KDI, specified in the contract, Paragraph F(2)(a), were not exclusive, as it claims, but "unlimited" the latter term being defined in Paragraph F(1)(b) in the following terms:

"b. 'Unlimited rights' means rights to use, duplicate, or disclose technical data, in whole or in part, in any manner and for any purpose whatsoever, and to have or permit others to do so." App. Vol. II, p. 328.

In this respect appellant does not cite to us any authority, or, indeed, usage, for the synonymous use of "unlimited" and "exclusive". Moreover, such interpretation would require the University to relinquish the original of the plans and designs, a result obviously not contemplated in a contract giving KDI merely the right to use, duplicate, or disclose the technical data. The University, through Dr. Chernow of its faculty, who was "the one we [KDI] looked to to control and direct the program" [4] did, in fact, give KDI unlimited access to the plans and designs, and the right to have copies, which were KDI's full rights, in this respect, under the contract. Since KDI had no rights to the original plans, testimony as to written requests therefor was properly excluded.

■ The trial court also excluded appellant's tendered testimony concerning the University's record of performance under a prior contract as disclosed in progress reports thereon. Although it is clear that the contract before us continued the work of prior contracts,[5] what we have before us is a contract complete in itself as to the duties and obligations of the parties thereto. It comprises a separate research contract and there is no intimation therein of the incorporation by reference of prior contracts, whatever they may have provided. There was no error in the exclusion of such evidence. In fact, in this whole controverted area of reports and technical data requested, received, denied, or delayed, the jury may well have been impressed by the testimony of Mr. Cox

---

4. Deposition of Walter G. Cox, President of KDI during the duration of the contract. App. Vol. I, p. 190.

5. "SEMICONDUCTOR STUDIES IN ION IMPLANTATION
   A. INTRODUCTION
   This proposal is for a renewal of the contract work presently being sponsored by the KDI Corporation and KDI Precision Products, Inc., at the University of Colorado (C.U.). The original contract was written be-

tween the Electro-Tec Corporation and C.U. and was limited to studies of electroluminescent materials, ferroelectrics and their application to display systems. The incorporation of Electro-Tec as a division of KDI brought with it a substantial broadening of the goals of this program. In this proposal for a continuation of the program, some new projects have been incorporated." Proposal, incorporated into and made a part of the Memorandum Agreement. App. Vol. II, p. 319.

(KDI's President) that "No time that I requested one [oral or written report from Dr. Chernow] that we didn't receive it," that no one employed by the University in its research contract ever refused to disclose any data derived from the research to the sponsors, and that he had the cooperation of the University's employees with respect to technical data retrieval and patent application prosecutions. Three invention disclosures were, in fact, it was testified, made from this project.

■ Additional argument concerning the University's alleged substantial failure of performance involved a device termed in the record the "OCL", or Optical Communications Link. This is a device sending out infrared light, consisting essentially of two sets of flashlights at each end, one flashlight being a transmitter, the other a receiver. The device is not new, relatively speaking, the first such link disclosed by the record having appeared in the 1967 World's Fair in Montreal.

So far as concerns the present case, the OCL was developed by Professors Baird and Hays with the help of two students. None of the funds therefor came from KDI, all having been furnished by the Computer Center of the University of Colorado. It was developed, it was testified "for one purpose and one purpose only." The University had decided to put a remote terminal, the Numerical Analysis Center, at the Engineering School, some six-tenths of a mile distant, but in their budgeting the cost of communications had through oversight been omitted. Telephone wires were sought to be used but the cost was prohibitive and thus the optical communications link was developed "to solve the problem of the University."

No KDI money went into the development. It was not developed by KDI employees, although there was testimony that Professor Baird, *supra,* shared laboratory space with Dr. Chernow, and that one Hassan Bahrami, while being paid from funds from the KDI project, built some circuits for it, but such, after being "checked out," were never used. It is not known what became of them.

The device was not developed under the KDI contract. The argument presented by KDI, that the OCL was developed to connect the University Computer with the DKI ion implanter (referring to Paragraph B(1)(e) of the contract) lacks both logical and evidentiary support. The contractual reference made is not to the University computer but to the Department computer, located only two floors below in the same building. It is highly illogical to argue that the development of OCL was thus necessary for the KDI program, a short distance away in the same building. Actually, Professor Baird, feeling that there was "no patentability for the optical communications link" as he developed it for use at the University, offered the "know-how" with respect thereto to KDI "because of the large amount of money that KDI had been expending on our program. We felt it would be just nice to make this offer available to KDI." KDI, however, after evaluating the OCL, decided that it was not of interest to them. We need not trace the further history of the OCL through another corporation which wound up in bankruptcy.

It was the conclusion of the trial court, after receiving extensive testimony and numerous exhibits, out of the presence of the jury, that, since OCL had not, beyond question, been a development under the KDI contract, there was no obligation on the part of the University to disclose the OCL to KDI. There being no legal duty of disclosure, failure to disclose could not constitute a breach and we find no error in the Court's exclusion of evidence before the jury of alleged breach of obligation.

In sum, the question of substantial performance was vigorously contested by both litigants and there was evidence both pro and con. The matter went to the jury under instructions substantially correct and we find no basis for disturbing the verdict. And we said in Baer

Bros. Land and Cattle Co. v. Reed, 197 F.2d 569 (10th Cir. 1952):

"Implicit in the jury's verdict is a finding of substantial performance of the contract. That finding is supported by competent evidence and it has binding effect here." 197 F.2d at 573.

■■ KDI also sought damages, by way of setoff, for the value of "certain inventions, equipment and technical data" which it claims were converted by the University. This contention, embodied in KDI's submitted Instruction 22, was rejected by the trial court in its entirety. It is well to bear in mind at the onset of our examination of this particular claim that the contract before us contains a section entitled "Rights Granted to KDI" specifying in detail just what KDI is to receive under the contract. The thrust thereof is that the University will assign "entire right, title, and interest in and to each Subject Invention and any application thereto for Letters Patent of the United States . . . ." to the sponsors. Ancillary thereto are clauses of implementation: That the University will obtain from each "technical person employed pursuant to this contract" an agreement that he will assign all his rights to any Subject Invention to the University or its assigns, and that the University shall make a written disclosure of each invention within a limited time, and further provisions of like import. But no claim is made to us on appeal that the University has asserted patent rights belonging to KDI. In fact, the University "concedes that any patents arising out of Precision Products" sponsored research belong to Precision Products. . . . ".[6] Rather the dispute centers upon the ownership of certain equipment employed in the research undertaken, principally the quadrupole ion implanter, the liquid electrostatic high voltage machinery, the crossed-field ion implanter and the monochromater.

This equipment was not that of the sponsors, loaned or assigned to the University for further research, although KDI funds contributed in part thereto. Thus, as to the quadrupole ion implanter, it was built in the summer of 1970, the testimony of Dr. Chernow being that the funds and equipment employed were those of the University itself, the Public Service Company, and General Electric. The most expensive part was an acceleration tube costing $8,000, of which sum KDI furnished $150 and the University the balance. A device denominated as "Granville Phillips nitrogen baffle," worth from $1500 to $2,000, was taken from another project and donated to the KDI project. The electrostatic high voltage generator was built in England, at the College of North Wales, and shipped to the University. "There was a period of reconstruction under the KDI contract at the University of Colorado to try to correct some of the problems with the machine."

It is unnecessary for our purpose to comb the record further for the origins of, and contributions of KDI to, the various pieces of equipment in controversy. The plain fact of the matter is that this is a research contract. The draftsmen thereof defined with care the "Patent Rights" that were to go to KDI as a result of the research, being careful to obtain commitment from the University that it would obtain an agreement covering patents from its employees who worked on the contract. We are aware that in the definitions sub-section of the Patent Rights paragraph of the contract the term "Subject Invention" is defined to include, but is not limited to any "art, method, process, machine, manufacture, design or composition of matter", a collocation of words apparently deriving from 35 U.S.C. §§ 100 and 101.[7] But in

6. Brief for the University, p. 8.

7. 35 U.S.C. § 100. Definitions
   When used in this title unless the context otherwise indicates—
       *     *     *     *     *

   (b) The term "process" means process, art or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material.
       *     *     *     *     *

the operative and dispositive portions of the contract, as it describes the research to be undertaken, there is no suggestion that title to the equipment was either in KDI or was to vest therein. As we have noted, various donors had contributed equipment to the programs and it is inconceivable to us, as it was to the trial court, that their contributions to the project, made to the University, should be vested in another program sponsor. We do not express an opinion, one way or the other, on whether the University might, by definitive document, vest title in another to such gifts. But it was clearly not done in the instrument before us. If the University were to be divested of its rights in the instruments under consideration, such divestiture, upon these facts, must appear from specific and unequivocal language relating thereto, which, as we see from the action granting patents rights, the parties were both able and willing to employ. The absence from the contract of such language does not, as KDI asserts, make for ambiguity but rather the opposite.

Under the circumstances here presented and above outlined, such cases as Solomons v. United States, 137 U.S. 342, 11 S.Ct. 88, 34 L.Ed. 667 (1890) and Standard Parts v. Peck, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560 (1924), cited by KDI, are inapplicable. *Solomons*, a suit for specific performance, held merely that where the chief of the Bureau of Engraving had devised a revenue stamp at the request of his superiors, and in his work he had used machinery of the Bureau at the expense of the United States, the United States had no implied license or shopright to use the stamp. *Standard Parts* was cited in United States v. Dubilier Condenser Corp., 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114 (1933) for the proposition that "One employed to make an invention, who succeeds, during his term of service, in ac-

complishing that task, is bound to assign to his employer any patent obtained. The reason is that he has only produced that which he was employed to invent. His intention is the precise subject of the contract of employment." So here. The subject of the University's employment was research directed towards the obtaining of patents. There is no argument here over title to or the assignment of patent rights. In fact "The University concedes that any patents arising out of Precision Products' sponsored research belong to Precision Products, and it does not now nor has it ever asserted any patent rights in the ion implanters, the high voltage generator or any other devise [sic] arising out of the research." [8]

It was the conclusion of the trial court that the contract under consideration being silent, either by apt word or necessary implication, as to the ownership of the equipment, was clear and unambiguous on its face and conferred no rights to the laboratory equipment or machines to Precision Products. We agree.

■ Various objections are made to the instructions given on this phase of the case, in two of which we find merit. The court gave University's Instruction 34, to the effect that where an employee is hired to invent, the resulting invention belongs to the employer, and University's Instruction 32, regarding the circumstances under which a patent may be obtained by an inventor.[9] Since, however, as a matter of law the court had ruled that title to the equipment and machines remained in the University, and since the patentability of inventions was not in issue, the giving of these instructions was error, not because of inaccuracy in their content, but under the familiar rule that instructions must relate to and cover the issues presented in

---

35 U.S.C. § 101. Inventions patentable
Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a pat-

ent therefor, subject to the conditions and requirements of this title.

8. University's Brief, p. 9.

9. App. Vol. II, p. 302.

the proofs. However, we fail to perceive how prejudice to the defendant could have resulted and we are unwarranted in ordering a reversal on such grounds. The Oklahoma court, in Gaddy v. Mid-Continent Freight Lines, Inc., Okl., 406 P.2d 479 (1965) well expresses the preferable rule in this situation:

"An instruction which states a correct proposition of law, but which has no application to the issues involved, on the proof, will not warrant a reversal of the case, unless it is apparent that the erroneous instruction probably misled the jury." 406 P.2d at 481.

■■ Error is charged with respect to the use by the University, in proving its damages, of computer print-outs, the appellant asserting that no foundation was laid as to input, programming, or functioning, and that no witness was called "who worked with the computer." With respect to such proofs error is also charged with respect to the court's refusal to permit the questioning of one Sybil Hume, an office worker, who "prepare[d] the invoices" as to what she knew "about the operation of the computer", the court ruling that her knowledge with respect thereto was immaterial.

All of the above ignores the actual issue presented in court. The computer print-out was offered as a summary only of voluminous records of charges to KDI. All of the original invoices pertaining to the KDI project were in court and available to all parties. Although KDI complains that "There was no evidence that any of the invoices in the boxes the University brought into the courtroom were part of the input into the computer or had anything to do with the computer" it would have been a simple matter for KDI to run a check as to any particular dates or invoices. Not having done so it is in no position to complain to this court as to possible omissions of invoices or of possible additions thereto.

It is well established, of course, that where original records are admissible as business records under 28 U.S.C. § 1732, summaries and tabulations thereof are likewise admissible. Fairchild Stratos Corp. v. Lear Siegler, Inc., 337 F.2d 785 (4th Cir. 1964). The topic is fully discussed in 5 Wigmore on Evidence, § 1530 (3rd Ed.). There was no error in the use of the computer print-outs under these circumstances.

With respect to its claim of setoff, KDI tendered proofs as to an alleged overdraft in the University's account with KDI at the end of the contract year. During the year covered by the contract before us the University had spent less than the amount budgeted for the year, $250,015. Obviously there was no overdraft here. KDI, however, sought to prove that in past years the University had spent more than the amounts budgeted to it for such years. As counsel for KDI put it, the overdraft sought to be established was "for an overdraft that occurred on the prior contract, and this is what I am going into this for, an overdraft on KDI project." [10] Counsel thus sought to review the accounting and budgeting on the entire project, involving the past contracts. It was the ruling of the court, after hearing testimony and receiving offers of proof, that KDI was attempting "to treat this as one account from the year 1966 through the completion of the September, 1969 contract" which, he held, "The facts elicited in the evidence do not justify . . . ." [11] The ruling was consistent with that theretofore made concerning the admissibility of progress reports on former contracts, and with respect to it, and for the same reasons, we also concur.

■ KDI also urges that there was error in allowing Dr. Chernow to testify that he had oral authorization from Mr. Cox to transfer charges erroneously entered against the Air Force to the KDI account. The situation here was that the Air Force program was coming to

10. App. Vol. II, p. 212.

11. App. Vol. II, p. 257.

an end on August 30, 1969. It was thought desirable to continue the cadmium sulfide work and, accordingly, it was assumed by KDI. In the billing, however, the charges of some $5,000 were continued against the Air Force, "so that it appeared as if the Air Force program had an overdraft." When the situation was brought to the attention of Mr. Cox he approved "formally transferring that obligation from the Air Force contract to the KDI contract." KDI asserts that such authorization violated the University-KDI contract which provided that the University would not exceed the budget without specific written authorization from the sponsors. But here there was no exceeding of the budget limitations of the contract before us. The overdraft was in the Air Force contract. We find no error in the receipt of such testimony or the instructions relating thereto in view of the arguments made.

■ The court rejected KDI's tendered instruction on damages and substituted another, which, appellant asserts, was not in sufficient detail fully to apprise the jury of the issues before it. We do not so regard it. The instruction given, while not as detailed as that submitted, adequately covered the issues submitted.[12] The situation presented in Kendall v. Hargrave, 142 Colo. 120, 349 P.2d 993 (1960), where, in a personal injury case, the jury was given "no guidance in the matter of compensation for physical injuries, loss of time, or pain and suffering resulting from the accident is clearly not before us. Many of the charges, particularly those pertaining to post-termination activities, were the subject of much dispute and, as the court observed in colloquy, "he can present his argument to the jury. You can present yours. And then what the jury ends up determining is, I assume, you will have to accept . . . ." The verdict returned for the University was substantially less than the amount claimed and we find no prejudicial error with respect thereto.

What we have considered here is a case of some complexity, both as to subject matter and accounting therefor. The case was fairly tried and the verdict well within the proofs. We have carefully considered the remaining allegations of error and find them without merit.

The judgment is affirmed.

---

12. "Plaintiff has brought this action to recover the amount which it claims is due it under the contract for the work and services performed up to the effective date of the termination of the agreement.

The plaintiff claims that this amount due is $202,657.42."

\*     \*     \*     \*     \*

"If the plaintiff did not substantially perform the contract, it can recover nothing. If it did substantially perform the contract, it is entitled to recover the amount which is due it under the contract, and that is one of the duties of the jury is to determine that amount.

The burden of proof is upon the plaintiff to prove by the preponderance of the evidence that it substantially performed the contract, also, to prove the amount it is entitled to recover."

\*     \*     \*     \*     \*

"In order for the plaintiff to recover, you must find that the defendant failed to pay the plaintiff's research costs which were to include (a) that portion of salaries paid by the University to staff properly chargeable to the project, and the wages of others used by the project.

(b) The cost of materials, services, and equipment contracted for the project.

(c) A charge equal to 50 per cent of (a), that is the salaries, covering the normal use of available University facilities and indirect costs in accordance with the University's customary accounting methods. Should the use of power, water or space become abnormal, it would be charged for under (b) above the prevailing rates." App. Vol. II, pp. 299, 301–302.