**MASTER PALLETIZER SYSTEMS, INC., a Colorado corporation, f/k/a Master Conveyor Corporation, Plaintiff,**

v.

**T.S. RAGSDALE COMPANY, INCORPORATED, a South Carolina corporation, Defendant.**

**Civ. A. No. 87–B–798.**

United States District Court, D. Colorado.

Nov. 29, 1989.

See also 123 F.R.D. 351.

---

Gwen S. Anderson, Law Offices of Gwen Anderson, Denver, Colo., for plaintiff.

Robert E. Warren, Jr., Peter R. Nadel, Gorsuch Kirgis Campbell Walker & Grover, Denver, Colo., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

BABCOCK, District Judge.

Plaintiff, Master Palletizer Systems, Inc. (Master), commenced this action alleging breach of contract and breach of the duty of good faith and fair dealing by defendant, T.S. Ragsdale Company, Incorporated (Ragsdale), in connection with the sale and installation of a palletizing system (system). Ragsdale counterclaims for breach of contract, deceit, intentional concealment, and punitive damages, based upon representations and concealments allegedly made both before and after contract formation. Master contends that Ragsdale's counterclaims are frivolous and groundless. Jurisdiction exists pursuant to 28 U.S.C. § 1332, and the parties stipulate that Colorado substantive law applies to this diversity action. Trial to the Court began October 30, 1989 and concluded November 8, 1989. Based upon all of the evidence and arguments presented, I enter judgment in favor of Master against Ragsdale upon the following findings of fact and conclusions of law.

### I. *Findings of Fact.*

Master, a Colorado corporation, is in the business of building and installing industrial machinery called "palletizers." Ragsdale, a South Carolina corporation, manufactures charcoal briquets at Conway, South Carolina. The briquets are then packaged at and sold from Lake City, South Carolina.

In May 1985, Ed Diggs (Diggs) of Ragsdale contacted a Master representative regarding the purchase and installation of a system for use at Ragsdale's Lake City plant. Diggs visited Master's manufactur-

ing facility in Colorado to inspect it and to meet with Master representatives.

In the Summer of 1985, based on its projected labor savings and independent investigation of palletizing systems, Ragsdale decided to purchase from Master an automatic palletizing system. Accordingly, on June 20, 1985 Master sent Ragsdale its Proposal No. 85–6–0763 which consisted of: (1) a cover sheet; (2) a one-page letter erroneously dated July 20, 1985 from Master's Jack Bertram (Bertram) to Smith Ragsdale; (3) a three-page letter from Bertram to Smith Ragsdale; and (4) general notes.

There is a factual dispute whether "Conditions of Sale" were included with Quotation No. 85–6–0763. Ragsdale claims that it never received the Conditions of Sale, but admits that it received the remainder of the proposal. Master's personnel testified that it was their regular and habitual practice to include these boilerplate Conditions of Sale with all initial proposals sent to customers and there was no reason to believe that they had failed to do so in this instance. Master's then president, John Mylrea (Mylrea), testified that it was his regular practice to review all proposals before mailing to ensure that all enclosures were present and that he would not have permitted a proposal to be mailed without the Conditions of Sale. I find that Ragsdale received the Conditions of Sale as part of Quotation No. 85–6–0763.

After further discussions between the parties regarding reducing the size and cost of the system, on July 9, 1989, and July 17, 1985 Master sent Ragsdale Revision 1 of Quotation No. 85–6–0763 (Revision 1), and Revision 2 of Quotation No. 85–6–0763 (Revision 2), respectively. These quotations provided for the design, manufacture, shipment (approximately 34 weeks after purchase order issue), installation, and start-up (including operator training) of the system.

Bertram met with Smith Ragsdale and Diggs on July 18, 1985. At Diggs request, Bertram reserved a production slot. In a letter dated July 22, 1985, Bertram informed Smith Ragsdale of yet additional items and prices discussed at the July 18,

1985 meeting that were not included in Revision 2. On August 2, 1985, Diggs telephoned Master informing Master that Ragsdale wanted to purchase the system and would send a purchase order.

Ragsdale prepared three purchase orders, Nos. 029529, 029530, 029531 dated August 15, 1985. Each order is signed by Steve Godwin, Ragsdale's purchasing agent, and each contains express language that the purchase order is contingent upon approval of industrial revenue bonds. Master received these purchase orders on August 31, 1985.

On September 10, 1985, Bertram wrote a letter to Diggs accepting Ragsdale's purchase orders. Delivery was scheduled during the week of March 3, 1986. The letter also confirmed their telephone conversation on that same date that alternate funding was available if the industrial revenue bonds were not approved.

In August 1985, Ragsdale placed orders with two other manufacturers, Rapistan and Muller, for additional equipment to convey and wrap full charcoal pallets. Diggs was responsible for coordinating the integration of this equipment with the Master system.

On October 17, 1985, Master's project engineer, Jamie Flot (Flot), visited Ragsdale's Lake City plant for initial engineering as required by the contract. He met with Diggs and representatives of Rapistan. At that time, Flot measured the building and certain products there being packaged and stored.

In November 1985, Diggs telephoned Master to discuss project payment and delivery of system drawings. During the next few weeks, Ragsdale requested additional changes in the system drawings that required Master to revise and modify the design. In late December 1985, Flot resigned from Master. On January 7, 1986, Diggs was informed that Matt Kraus (Kraus) would be the new project engineer.

In January 1986, Ragsdale requested a change to the catwalks around the system and in February 1986, Master determined that the entire structural support system should be revised. Therefore, on February

18, 1986, Kraus telephoned Diggs to inform him that delivery would be delayed until mid-May.

Ragsdale objected to the delay and demanded compensation for the delay and interest on sums it had already paid to other equipment vendors. Master agreed to provide additional personnel and training for the start up of the system but refused to pay interest. Ragsdale expressed concern that the delay would interfere with its peak charcoal production period but it neither canceled its order nor rescheduled delivery. Ragsdale instead insisted that delivery be made by mid-May.

Smith Ragsdale and Diggs attended a pre-delivery "acceptance test" for the system held at Master's Colorado plant on May 7, 1986. Upon completion of the test, they expressed to Master dissatisfaction because the accumulation portion of the system was not then erected and tested and the computer program for the accumulation system had not been completed. Again, Ragsdale did not cancel the order or otherwise halt production of the system.

Master began shipping the system to Ragsdale's plant in the first week of May 1986. Installation of the system began on May 15, 1986, and was completed during the first week of June. However, Master's start-up and debugging of the system extended over several months and required mechanical and programming changes. The system met contract specifications in October 1986.

On November 14, 1986, Master determined that Ragsdale's remaining objections had been satisfied and that the system operated to contract specifications. Master demanded payment of the balance due on the system. Ragsdale refused to pay, advising Master that the system was not working properly and was not achieving quoted rates. The contract price, including revisions, was $493,815.00. Ragsdale made payments totalling $239,270.00, leaving $253,775.00 unpaid. Interest on this unpaid balance at 1 per cent per month from November 14, 1986 to October 30, 1989 is $90,191.00.

The Master system sold to Ragsdale was described as "fully automatic." Ragsdale claims that this means that the system should require no human involvement except to start and stop its operation. Because Ragsdale assigns a full-time operator to attend to the system, Ragsdale argues that the system is not fully automatic.

Master's evidence established that the this system is fully automatic because there is no human element designed into the machine's regular operation. Master personnel testified that, barring normal mechanical difficulties, the system operated without assistance by October 5, 1986. I find that the palletizing system sold to Ragsdale is fully automatic. The machine is designed to and substantially performs its job without human intervention as part of the process.

The maximum rates specified for the system's operation are contained both on the mechanical drawings and in Bertram's December 27, 1985 letter. The evidence established that the system achieved these specified rates by October 5, 1986.

In 1986 and 1987, Ragsdale filled all orders it received for charcoal briquets. No orders were cancelled. Historically, Ragsdale's Conway briquet production plant, operating 168 hours per week, 50 weeks per year, has produced 4.09 tons of charcoal briquets per hour. The evidence demonstrates that Ragsdale has operated this plant at a 70.1 per cent efficiency rate from 1984 through 1988, or an average of 48,373 tons of briquets per year.

In April 1986, Ragsdale reduced the operating hours of its bagging plant by 40 hours per week. Nevertheless, the system has demonstrated its ability to handle quantities of bagged charcoal that exceed historical briquet production averages. The system has not impeded charcoal production. The annual Conway briquet production has been handled by the system at Lake City's reduced hours of operation.

Ragsdale has made changes to the system's computer program. These changes have slowed the system's production rate. Even so, the system handles the Conway briquet production.

Ragsdale claims that the system did not achieve the expected level of labor savings.

Although start-up costs exceeded those reasonably anticipated by $19,800, the evidence shows that Ragsdale has and will continue to realize greater labor savings than reflected in its "savings study" which Ragsdale prepared and relied upon shortly before the system was purchased. Consequently, I find that Ragsdale did not expect to receive any greater labor savings from the system than those achieved.

In January 1988, Gregory Toller, Ragsdale's Sales Manager, left the company. A new Sales Manager was not hired until approximately May 1988.

Ragsdale has presented no satisfactory evidence from which I can find that its inability to sell more charcoal is caused by problems with the system. To the contrary, the evidence shows that Ragsdale sold more tonnage of charcoal in fiscal year 1987, the year the palletizer was installed and the year of greatest operational disruption, than in either of the preceding or following fiscal years. Additionally, there is no satisfactory evidence to support Ragsdale's contention that it would have sold more charcoal had the palletizer worked more quickly and allowed greater production volume. The evidence shows that charcoal sales are largely a function of price and in recent years the market has burned out.

Ragsdale claims that its costs and prices are inflated because of problems with the palletizer, lowering its ability to compete. However, there is neither satisfactory evidence of such cost increases nor satisfactory evidence of any causal relation between increased costs attributable to the machine and Ragsdale's place in the market. Rather, the evidence shows that there is heavy competition in Ragsdale's national and regional markets, forcing competitors to continually lower prices in order to stay competitive. There is no satisfactory evidence that Ragsdale has lost national or regional market share or sales.

Master made no knowing or recklessly false representation to Ragsdale regarding its ability timely to test, deliver, install, and start-up the system according to specifications. There was no misrepresentation of Master's prior experience or with the system's ability to palletize Ragsdale's product. Diggs and Smith Ragsdale observed Master's systems in operation at Kingsford Charcoal and relied substantially upon Kingsford's satisfactory experience with Master in purchasing the Master system.

Installation was complete within the two weeks estimated by Master. Although start-up took longer than the additional estimated two weeks, Master did not knowingly or recklessly misrepresent this time frame. By October 1986, the completed system was "automatic" as represented and operated according to contract specifications.

Master's representations are contained fully within the contract documents. These documents do not represent that the system would handle Ragsdale's total bagging capacity. Had such representations been made, however, I find that the system can and does handle Ragsdale's historic production, and thus, bagging capacity.

An engineer was sent to Ragsdale's bagging plant and the system was delivered within the contract's time requirements. Further, there is no credible evidence that Master intentionally or recklessly concealed any material facts that should have been disclosed to Ragsdale during the course of performance. Finally, Ragsdale has proved no damage suffered as a result of any alleged misrepresentation or concealment.

## II. Conclusions of Law.

### A. Breach of Contract.

Master contends that it substantially performed its contract with Ragsdale and is entitled to an award of the balance of the purchase price together with interest at 1 per cent per month from November 14, 1986 to October 30, 1989, less offset for excess start-up costs. Ragsdale denies that it breached the contract and argues that Master's claims are barred by Master's breach.

The parties agree that a contract exists. They disagree as to when it was formed. This date is important in determining whether Master unreasonably delayed its performance.

The existence of a contract is a question of fact to be determined by consideration of all facts and circumstances. *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882 (Colo.1986). An offer and an assent manifested by act or conduct constitute a contract. *Linder v. Midland Oil Refining Co.*, 96 Colo. 160, 40 P.2d 253 (1935). I conclude that the contract was formed on September 10, 1985 under two alternative theories.

### 1. Contract Formation and Terms.

#### a. *Invitation to Make an Offer.*

A price quotation or proposal is generally not an offer, but is an invitation to enter into negotiations or a preliminary solicitation of an offer. *Nations Enterprises, Inc. v. Process Equipment Co.*, 40 Colo.App. 390, 579 P.2d 655 (1978). While price quotations, if detailed enough, can amount to an offer creating the power of acceptance, *Brown Machine v. Hercules, Inc.*, 770 S.W.2d 416 (Mo.App.1989), the submission of a purchase order by a buyer in response to a price quotation usually constitutes the offer. *Brown Machine v. Hercules, Inc., supra; Maurice Elec. Supply Co. v. Anderson Safeway Guardrail Corp.*, 632 F.Supp. 1082 (D.D.C.1986).

I conclude that Master's quotation was intended to be an invitation to enter into negotiations for the system. The cover letter accompanying the proposal mentioned that Smith Ragsdale should contact Master "to discuss the operation" and that different options are available. Thus, when Ragsdale submitted its purchase order on August 31, 1985, it offered to purchase the system from Master. Master accepted Ragsdale's offer in its September 10, 1985 letter which stated, "[t]he following letter is being submitted as Master Conveyor's *acceptance* of referenced purchase orders." (Emphasis added).

#### b. *Counteroffer.*

Section 4–2–207(1), C.R.S. 1973, Colorado's version of the Uniform Commercial Code § 2–207, provides that:

A definite and seasonal expression of acceptance or a written confirmation which is sent within a reasonable time, operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, *unless acceptance is expressly made conditional on assent to the additional or different terms.* (Emphasis added).

Under this section, whenever an offeree's acceptance contains terms that materially alter the contract, and the offeree has conditioned his participation on the offeror's acceptance of such terms, *see Reaction Molding Technologies, Inc. v. General Elec. Co.*, 588 F.Supp. 1280 (E.D.Pa. 1984), the offeree's response becomes a counteroffer, to be accepted or rejected by the offeror, rather than an acknowledgment of the original offer. *See Id; Alloy Computer Products, Inc. v. Northern Telecom, Inc.*, 683 F.Supp. 12 (D.Mass. 1988); *See also Nucla Sanitation District v. Rippy*, 140 Colo. 444, 344 P.2d 976 (1959).

Here, even if Master's quotation is considered an offer, rather than an invitation to make an offer, Ragsdale's purchase orders, which added language explicitly making its obligation to purchase the system contingent upon approval of industrial revenue bonds, constituted a counteroffer. *See* J. White & R. Summers, *Uniform Commercial Code* § 1–3 at 38 (3d ed.1988); *See also Nucla Sanitation District, supra; cf. Westinghouse Elec. Corp. v. Nielsons, Inc.*, 647 F.Supp. 896 (D.Colo.1986). The counteroffer was then accepted by Master in its September 10, 1985 letter.

### 2. The Conditions of Sale

In the absence of fraud or concealment, a party signing a contract cannot deny knowledge of its contents. *O'Brien v. Houston*, 83 Colo. 109, 262 P. 1020 (1927). A party need not sign every page of a contract for the whole of the document to be effective. *Westinghouse Elec. Corp. v. Nielsons, Inc., supra.* A contract may consist of two or more writings when so intended and relating to the same subject matter. *Grizzly Bar, Inc. v. Hartman*, 169 Colo. 178, 454 P.2d 788 (1969).

Ragsdale contends that it never received the Conditions of Sale, but admits

receiving all other writings that form the agreement. Bertram testified in deposition that it was Master's regular business practice to include the Conditions of Sale in each proposal. Bertram further testified that he had no reason to believe that the Conditions of Sale were omitted from the proposal sent to Ragsdale. Mylrea testified that he reviewed every proposal to insure that all enclosures were attached. Mylrea also testified that he would not have allowed the proposal to be mailed absent all documents attached. Having found that Ragsdale received the Conditions of Sale, *see* Fed.R.Evid. 406, I conclude that Ragsdale is bound by their terms.

### 3. Contract Performance.

Ragsdale contends that Master delayed its performance in material respects and thus breached the contract. Master argues that it has substantially performed the contract. I conclude that Master has substantially performed.

 Substantial performance of a contract means that although there is deviation from conditions of the contract in minor details, not materially detracting from the benefit the other party would derive from a literal performance, the other party has received substantially the benefit expected, and therefore, is bound to pay. *Rohauer v. Little*, 736 P.2d 403 (Colo.1987); *Newcomb v. Schaeffler*, 131 Colo. 56, 279 P.2d 409 (1955); *See University of Colorado v. K.D.I. Precision Products, Inc.*, 488 F.2d 261 (10th Cir.1973).

 Although the General Notes portion of Master's proposal calls for Master's engineering visit to occur immediately after receipt of the purchase orders, Diggs testified in deposition that he understood this to mean thirty days. Flot made the initial engineering visit to Ragsdale's plant on October 17, 1985, thirty-seven days after contract formation. The contract did not provide that time was of the essence. Thus, I conclude that the initial engineering visit occurred within a reasonable time.

The system drawings were to be sent to Ragsdale on November 7, 1985, twenty-one days following Flot's visit. The drawings were not delivered until November 27th. However, the drawings were delayed because of additional charges requested by Ragsdale. Hence, they were delivered within a reasonable time.

On May 7, 1986, when Smith Ragsdale and Diggs attended the acceptance test at Master's Englewood facility, neither man expressed any significant dissatisfaction with the system. Nor did they direct Master to stop work or to delay delivery for any reason. The system was delivered to Ragsdale beginning the first week in May.

After Ragsdale learned that delivery would be postponed, it demanded additional training and interest on sums paid to other vendors. Master agreed to and did furnish additional training services but refused to pay interest. Thus, the parties formed an independent agreement that Ragsdale receive extra consideration in exchange for any delay in delivery. Ragsdale may not now seek further damages or other relief for delivery delay.

Moreover, the contract, Revision 2, provides a shipment date of approximately 34 weeks following issuance of the purchase order. The purchase orders were issued on August 15, 1985 and received by Master on August 31, 1985. The system originally was scheduled for delivery the week of March 3, 1986. However, because both Ragsdale and Master made certain design modifications and because there was a change of project engineers, Master informed Ragsdale in February 1986 that delivery would be delayed until mid-May. Early May is reasonably within the 34 week shipment period provided for in the contract, Revision 2. And, as the Conditions of Sale indicate in paragraph 4, the specified shipment date is approximate only. Moreover, Ragsdale's purchase order contains the precatory language that "If At Any Way Possible This Equipment should be delivered by 3–1–86." None of the contract documents reflect an intention that time was of the essence. I conclude, therefore, that delay, if any, in the shipment and delivery of the system was neither unreasonable nor a material breach of contract.

Installation of the system began on May 15, 1986 and was completed timely by June 1, 1986. Master admits that start-up took longer than expected and extended into October 1986. During this period, Ragsdale sustained excess labor overtime costs of $19,800. Master concedes that Ragsdale is entitled to a setoff of $19,800 against Master's damages.

By October 5, 1986 the system was fully operational and the specified rates for palletizing Ragsdale's charcoal products had been achieved. Ragsdale has continuously and profitably used the system since that time in its daily operations. Ragsdale has never abandoned the system or stopped using the system for any significant period.

I conclude that Master substantially performed its obligations under the contract, that Ragsdale received substantially the benefit it expected, and that Ragsdale is bound to pay the contract price balance, plus interest, less setoff. Accordingly, Ragsdale breached the contract by refusing to pay this balance due.

B. Ragsdale's Breach of Covenant of the Good Faith and Fair Dealing.

■■■■ C.R.S. § 4–1–203 requires that "[e]very contract or duty within this title imposes an obligation of good faith in its performance or enforcement." Good faith in the case of a merchant is defined as honesty in fact and the observance of reasonable commerical standard of fair dealing in the trade. C.R.S. § 4–2–103(b). I conclude as a matter of law that Master has failed to meet its burden of proof regarding Ragsdale's breach of the convenant of good faith and fair dealing.

III. *Ragsdale's Counterclaims.*

A. Master's Breach of Contract.

For the reasons set forth above, Ragsdale has failed to prove Master's prior breach of contract. (Setoff is allowed for Ragsdale's excess costs incurred during Master's admitted delay in system start-up).

B. Ragsdale's Claim for Deceit.

The elements of a cause of action for deceit are: 1) a false representation of a material fact; 2) made with knowledge of

the falsity or with reckless disregard of its truth or falsity; 3) made with the intent that the plaintiff act on the misrepresentation; 4) the party claiming fraud must have justifiably relied on the misrepresentation; and 5) in doing so suffered damage. *Trimble v. Denver,* 697 P.2d 716 (Colo.1985); *Morrison v. Goodspeed,* 100 Colo. 470, 68 P.2d 458, 462 (1937).

■■■■ Under the facts of this case, I conclude that Ragsdale has failed to prove that Master made knowing or recklessly false representations to Ragsdale regarding its experience and ability to test, deliver, install, and start-up the automatic system according to specifications. As a matter of fact and law, Master substantially performed its contract with Ragsdale.

Moreover, although Ragsdale argues that it relied solely on Master's misrepresentations, both Smith Ragsdale and Diggs testified at trial that they also relied heavily upon Kingsford in making the decision to purchase the Master system. Ragsdale also relied substantially on its own labor savings projections. Finally, Ragsdale has suffered no damage as a result of any alleged misrepresentation. Therefore, I conclude that Ragsdale has failed to prove its claim of deceit.

C. Fraudulent Concealment.

■■■■ In order to establish a prima facie case of fraudulent concealment, Ragsdale must prove: 1) concealment of a material existing fact that in equity and good conscience should be disclosed; 2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; 3) ignorance of that fact on the part of the one from whom the fact is concealed; 4) the intention that the concealment be acted upon; and 5) action on the concealment resulting in damage. *Kopeikin v. Merchants Mortgage & Trust Corp.,* 679 P.2d 599 (Colo.1984).

■■■■ Ragsdale contends that after entering into the contract, Master had knowledge of additional material facts which it recklessly disregarded or knew would render Master's performance under the con-

tract impossible or highly unlikely. However, for the reasons set forth above, I conclude that Ragsdale failed to meet its burden of proving that Master intentionally or recklessly concealed any facts that ought to have been made known to Ragsdale. Master substantially performed its contract with Ragsdale. Thus, I further conclude that Ragsdale has not demonstrated that Master's performance under the contract was either impossible or improbable. And, as I discuss in the following sections, Ragsdale has suffered no damages.

## D. Damages.

Here, as a matter of fact and law, Master has neither breached its contract with Ragsdale nor committed a tortious act. However, I discuss this issue to render complete my Fed.R.Civ.P. 52 findings and conclusions.

### 1. Punitive Damages.

Ragsdale failed to show that any of Master's actions were attended circumstances of wanton or reckless conduct under C.R.S. § 13–17–102. Accordingly, Ragsdale's claim for punitive damages was dismissed at trial pursuant to 41(b).

### 2. Compensatory Damages.

#### a. *Additional Operator Costs.*

Because it must employ one full-time operator per shift to run the system represented by Master to be "fully automatic", Ragsdale contends that it is entitled to recover the cost of these operators for the useful life of the system. I have rejected this claim as a matter of fact and law.

#### b. *Additional Equipment Costs.*

■ Ragsdale claims damages for the cost of additional equipment. Ragsdale admits that Diggs was responsible for coordinating the phases of the project involving different contractors. However, Ragsdale contends that because Master delayed delivery, equipment put into place by other contractors had to be moved and augmented to fit with Master's equipment. Ragsdale claims that it was required to expend an additional $13,024.00 to coordinate the entire system.

First, Master did not unreasonably delay delivery. Furthermore, during the initial engineering visit, Flot met with a representative of Rapistan, one of Ragsdale's other contractors. At that time, it was discovered that Rapistan designed its conveyors to accept the pallets lengthwise. However, the Master system ejected the pallets widthwise. Thus, Rapistan had to design a turntable to rotate the pallet 90 degrees.

Rapistan previously had provided drawings to Diggs, who could have coordinated with Master at that time, but neglected to do so. Moreover, Rapistan's purchase orders did not contain the bond contingency language placed on Master's purchase orders, and Rapistan's schedule was ahead of Master's.

Therefore, Ragsdale has failed to prove that the coordination or work among the equipment contractors was Master's responsibility. There was no agreement between Master and Ragsdale to that effect. Rather, the evidence shows that Diggs was responsible for coordinating the contractors' work. The evidence also shows that Diggs blamed Rapistan for the mix-up and that Ragsdale was made whole by Rapistan.

#### c. *Additional Labor Costs and Lost Labor Savings.*

■ Ragsdale claims that had Master's equipment been installed and functioning earlier, it would have saved greater labor expenses than actually realized. Ragsdale bases its argument on a "cost savings analysis" it prepared before it purchased the Master system. According to this study, Ragsdale projected that it would save $43,055.00 in the first five years of operation. The evidence shows, however, that Master's system exceeded Ragsdale's anticipated labor savings by $155,000.00.

This claim is disingenuous. Ragsdale, having saved more labor costs than expected at the time the contract was formed, cannot now, in hindsight, claim more than was then contemplated.

### d. *Interest on Bills Paid to Third Party Contractors.*

Ragsdale claims interest on sums paid to other equipment contractors for the period of time that delivery and start-up was delayed. I conclude that Ragsdale is not entitled to interest on bills relating to the system paid to third parties. Master did not agree to pay interest during this period of time. Instead Ragsdale agreed to receive additional training and support in consideration for any delayed delivery and start-up date. Moreover, Master has substantially performed its obligations under the contract. Accordingly, Ragsdale is responsible for timely paying its third-party contractors.

### 3. Lost Profits.

In order to recover lost profits, a plaintiff must show that a defendant's breach or tortious conduct was the proximate cause of its injury. *Prutch v. Ford Motor Co.,* 618 P.2d 657 (Colo.1980). Recovery of lost profits is determined by whether the consequences resulting in damages were foreseeable. *Id.* Lost profits are not recoverable if either the amount of the profit that would have been earned or the fact that the plaintiff would have earned them is too speculative, remote, imaginary, or impossible to ascertain. *Republic Nat'l Life Ins. v. Red Lion Homes, Inc.,* 704 F.2d 484 (10th Cir.1983).

The facts show that Ragsdale lost no sales. No orders were cancelled and none were unfilled. In fiscal year 1987, the year in which the system was installed, Ragsdale's charcoal sales actually exceeded the average of the two previous years.

Ragsdale, however, claims lost profits for charcoal briquets that it claims it could have produced and sold had the system performed properly. However, the evidence demonstrates that historically, Ragsdale's Conway production plant operated at a 70.1 per cent efficiency rate, and its maximum rate of production was 48,373 tons per year. Hence, there is no satisfactory evidence that Ragsdale could have produced additional tonnage for bagging regardless of system limitation.

Moreover, even if it could produce the extra tonnage, Ragsdale failed to prove that it could have sold the additional briquets. Ragsdale's former production sales manager, Gregory Toller, speculated that he could have sold the additional briquets, but admitted that he could not prove that he would have sold the extra charcoal for which lost profits are claimed. Ragsdale presented no evidence of probable buyers to whom he could have sold briquets at a specified price. *See Cope v. Vermeer Sales and Service of Colo.,* 650 P.2d 1307 (Colo.App.1982). Toller also admitted that it was unclear what Ragsdale's competitors would have done in light of increased competition. The evidence further shows that Ragsdale's inventory of briquets has increased steadily since 1986. This indicates its inability to sell additional amounts of charcoal, not a system limitation. Moreover, the evidence shows a flat national market for charcoal briquets in recent years and that Ragsdale has intense competition for sales in its markets.

I conclude that Ragsdale's claims for lost profits is speculative, remote, and imaginary. *See Republic Nat'l Life Ins. v. Red Lion Homes, Inc., supra.*

### E. Groundless and Frivolous Counterclaims.

I finally conclude that Ragsdale's counterclaims and defenses are neither groundless nor frivolous. *See* § 13–17–102 C.R.S.

### IV. *Conclusion.*

Master has established that it substantially performed its contract with Ragsdale, that Ragsdale has breached its contract with Master, and that as a result, Ragsdale is indebted to Master for $253,775, plus $90,191 interest, less setoff of $19,800. Master has not established its claim of breach of § 4–1–203 C.R.S. Ragsdale has failed to prove its counterclaims of breach of contract, deceit, or fraudulent concealment. Accordingly, based on the Findings of Fact and Conclusions of Law made above IT IS ORDERED that:

1. Judgment shall enter in favor of Master and against Ragsdale for $324,166,

plus interest thereon from the date of judgment.

2. Judgment shall enter in favor of Master and against Ragsdale on Ragsdale's counterclaims for intentional misrepresentation, intentional concealment, breach of contract, and punitive damages.

3. Master is awarded its reasonable costs.