724 F.Supp. 605 (1989)
CORINTHIAN PHARMACEUTICAL SYSTEMS, INC., Plaintiff,
v.
LEDERLE LABORATORIES, Defendant.
No. IP86-1076-C.
United States District Court, S.D. Indiana, Indianapolis Division.
October 30, 1989.
*606 Sherwood P. Hill, Maurer Rifkin & Hill, Indianapolis, Ind., for plaintiff.
John T. Murphy, Ice Miller Donadio & Ryan, Indianapolis, Ind., for defendant.

ORDER ON MOTION FOR SUMMARY JUDGMENT
McKINNEY, District Judge.
This diversity action, which is presently set for trial by jury on December 18, 1989, comes before the Court on the defendant's motion for summary judgment. The issues raised have been fully briefed and the parties have submitted supporting evidence. The issues raised were ripe as of July 21, 1989. For the reasons set forth below, the Court GRANTS the motion.

I. FACTUAL AND PROCEDURAL BACKGROUND[1]
Defendant Lederle Laboratories is a pharmaceutical manufacturer and distributor that makes a number of drugs, including the DTP vaccine. Plaintiff Corinthian Pharmaceutical is a distributor of drugs that purchases supplies from manufacturers such as Lederle Labs and then resells the product to physicians and other providers. One of the products that Corinthian buys and distributes with some regularity is the DTP vaccine.
In 1984, Corinthian and Lederle became entangled in litigation when Corinthian ordered more than 6,000 vials of DTP and Lederle refused to fill the order.[2] That lawsuit was settled by written agreement whereby Lederle agreed to sell a specified amount of vaccine to Corinthian at specified times. Lederle fully performed under the 1984 settlement agreement, and that prior dispute is not at issue. One of the conditions of the settlement was that Corinthian "may order additional vials of [vaccine] from Lederle at the market price and under the terms and conditions of sale in effect as of the date of the order."
After that litigation was settled Lederle continued to manufacture and sell the vaccine, and Corinthian continued to buy it from Lederle and other sources. Lederle periodically issued a price list to its customers for all of its products. Each price list stated that all orders were subject to acceptance by Lederle at its home office, and indicated that the prices shown "were in effect at the time of publication but are submitted without offer and are subject to change without notice." The price list further *607 stated that changes in price "take immediate effect and unfilled current orders and back orders will be invoiced at the price in effect at the time shipment is made."
From 1985 through early 1986, Corinthian made a number of purchases of the vaccine from Lederle Labs. During this period of time, the largest single order ever placed by Corinthian with Lederle was for 100 vials. When Lederle Labs filled an order it sent an invoice to Corinthian. The one page, double-sided invoice contained the specifics of the transaction on the front, along with form statement at the bottom that the transaction "is governed by seller's standard terms and conditions of sale set forth on back hereof, notwithstanding any provisions submitted by buyer. "Acceptance of the order is expressly conditioned on buyer's assent to seller's terms and conditions."
On the back of the seller's form, the above language was repeated, with the addition that the "[s]eller specifically rejects any different or additional terms and conditions and neither seller's performance nor receipt of payment shall constitute an acceptance of them." The reverse side also stated that prices are subject to change without notice at any time prior to shipment, and that the seller would not be liable for failure to perform the contract if the materials reasonably available to the seller were less than the needs of the buyer. The President of Corinthian admits seeing such conditions before and having knowledge of their presence on the back of the invoices, and Corinthian stipulates that all Lederle's invoices have this same language.[3]
During this period of time, product liability lawsuits concerning DTP increased, and insurance became more difficult to procure. As a result, Lederle decided in early 1986 to self-insure against such risks. In order to cover the costs of self-insurance, Lederle concluded that a substantial increase in the price of the vaccine would be necessary.
In order to communicate the price change to its own sales people, Lederle's Price Manager prepared "PRICE LETTER NO. E-48." This document was dated May 19, 1986, and indicated that effective May 20, 1986, the price of the DTP vaccine would be raised from $51.00 to $171.00 per vial. Price letters such as these were routinely sent to Lederle's sales force,[4] but did not go to customers.[5] Corinthian Pharmaceutical did not know of the existence of this internal price letter until a Lederle representative presented it to Corinthian several weeks after May 20, 1986.
Additionally, Lederle Labs also wrote a letter dated May 20, 1986, to its customers announcing the price increase and explaining the liability and insurance problems that brought about the change. Corinthian somehow gained knowledge of this letter on May 19, 1986, the date before the price increase was to take effect. In response to the knowledge of the impending price increase, Corinthian immediately ordered 1000 vials of DTP vaccine from Lederle. Corinthian placed its order on May 19, 1986, by calling Lederle's "Telgo" system. The Telgo system is a telephone computer ordering system that allows customers to place orders over the phone by communicating with a computer. After Corinthian placed its order with the Telgo system, the computer gave Corinthian a tracking number for its order. On the same date, Corinthian sent Lederle two written confirmations of its order. On each form Corinthian stated that this "order is to receive the $64.32 per vial price."
On June 3, 1986, Lederle sent invoice 1771 to Corinthian for 50 vials of DTP vaccine priced at $64.32 per vial. The invoice contained the standard Lederle conditions noted above. The 50 vials were sent to Corinthian and were accepted. At the same time, Lederle sent its customers, including Corinthian, a letter regarding DTP *608 vaccine pricing and orders.[6] This letter stated that the "enclosed represents a partial shipment of the order for DTP vaccine, which you placed with Lederle on May 19, 1986." The letter stated that under Lederle's standard terms and conditions of sale the normal policy would be to invoice the order at the price when shipment was made. However, in light of the magnitude of the price increase, Lederle had decided to make an exception to its terms and conditions and ship a portion of the order at the lower price. The letter further stated that the balance would be priced at $171.00, and that shipment would be made during the week of June 16. The letter closed, "If for any reason you wish to cancel the balance of your order, please contact [us] ... on or before June 13."
Based on these facts, plaintiff Corinthian Pharmaceutical brings this action seeking specific performance for the 950 vials of DTP vaccine that Lederle Labs chose not to deliver.[7] In support of its summary judgment motion, Lederle urges a number of alternative grounds for disposing of this claim, including that no contract for the sale of 1000 vials was formed, that if one was formed, it was governed by Lederle's terms and conditions, and that the 50 vials sent to Corinthian were merely an accommodation. Before reaching these issues, the relevant summary judgment standards must be set forth.

II. SUMMARY JUDGMENT STANDARDS
Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Further, Rule 56(e) provides:
When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.
Since the Supreme Court's trilogy of decisions on summary judgment, see Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), it is clear that the mandatory aspects of Rule 56 must be followed by the district courts, and, as a result, summary judgment must be entered where appropriate. Decisions of the Seventh Circuit reflect this change in attitude as well. See, e.g., Herman v. City of Chicago, 870 F.2d 400, 404 (7th Cir. 1989); Spellman v. Commissioner, 845 F.2d 148, 152 (7th Cir.1988); Collins v. Associated Pathologists, Ltd., 844 F.2d 473 (7th Cir.1988). In short, it is the advocates, not the courts, who must press their claims and vigorously oppose the motion for summary judgment. See, e.g., Herman v. City of Chicago, 870 F.2d 400, 404 (7th Cir.1989) (courts need not scour record to support a party's claim at summary judgment; adversaries are to pursue their cases and courts are to rule accordingly).
Additionally, affidavits submitted at summary judgment must "set forth such facts as would be admissible in evidence," and "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The Seventh Circuit *609 has recently interpreted this rule strictly, requiring affidavits to contain more than broad conclusions. See, e.g., Mid-State Fertilizer v. Exchange National Bank, 877 F.2d 1333 (7th Cir.1989). Cf., Randle v. LaSalle Telecommunications, Inc., 876 F.2d 563 (7th Cir.1989) (hearsay cannot be considered under Rule 56(e)).
Finally, the Seventh Circuit has made it clear that issues of motive or intent may properly be decided by way of summary judgment where there are no genuine issues of material fact on the issue. See, e.g., Corrugated Paper Products, Inc. v. Longview Fibre Co., 868 F.2d 908, 913-14 (7th Cir.1989); McMillian v. Svetanoff, 878 F.2d 186, 188 (7th Cir.1989); Morgan v. Harris Trust and Savings Bank of Chicago, 867 F.2d 1023, 1026 (7th Cir.1989) (summary judgment "will not be defeated simply because issues of motive or intent are involved").
With these standards at hand, the Court will address the substantive questions raised.

III. DISCUSSION
Despite the lengthy recitation of facts and summary judgment standards, this is a straightforward sale of goods problem resembling those found in a contracts or sales casebook. The fundamental question is whether Lederle Labs agreed to sell Corinthian Pharmaceuticals 1,000 vials of DTP vaccine at $64.32 per vial. As shown below, the undisputed material facts mandate the conclusion as a matter of law that no such agreement was ever formed.

A. Lederle Labs Never Agreed to Sell 1,000 Vials at the Lower Price:

Initially, it should be noted that this is a sale of goods covered by the Uniform Commercial Code, and that both parties are merchants under the Code. The parties do not discuss which state's laws are to apply to action, but because the Code is substantially the same in all states having any connection to this dispute, the Court will, for ease of reference, refer in general to the U.C.C. with relevant interpretations from Indiana and other states.[8]
The starting point in this analysis is where did the first offer originate. An offer is "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." H. Greenberg, Rights and Remedies Under U.C.C. Article 2 § 5.2 at 50 (1987) [hereinafter "Greenberg, U.C.C. Article 2"], (quoting 1 Restatement (Second), Contracts § 4 (1981)). The only possible conclusion in this case is that Corinthian's "order" of May 19, 1986, for 1,000 vials at $64.32 was the first offer. Nothing that the seller had done prior to this point can be interpreted as an offer.
First, the price lists distributed by Lederle to its customers did not constitute offers. It is well settled that quotations are mere invitations to make an offer, Greenberg, U.C.C. Article 2 § 5.2 at 51; Corbin on Contracts §§ 26, 28 (1982), particularly where, as here, the price lists specifically stated that prices were subject to change without notice and that all orders were subject to acceptance by Lederle. Greenberg, U.C.C. Article 2 § 5.2 at 51; Quaker State Mushroom v. Dominick's Finer Foods, 635 F.Supp. 1281, 1284 (N.D. Ill.1986) (No offer where price quotation is subject to change and orders are subject to seller's confirmation); Interstate Industries, Inc. v. Barclay Industries, Inc., 540 F.2d 868, 873 (7th Cir.1976) (price quotation not an offer).
Second, neither Lederle's internal price memorandum nor its letter to customers dated May 20, 1986, can be construed as an offer to sell 1,000 vials at the lower price. There is no evidence that Lederle intended Corinthian to receive the internal price memorandum, nor is there anything in the record to support the conclusion that *610 the May 20, 1986, letter was an offer to sell 1,000 vials to Corinthian at the lower price. If anything, the evidence shows that Corinthian was not supposed to receive this letter until after the price increase had taken place. Moreover, the letter, just like the price lists, was a mere quotation (i.e., an invitation to submit an offer) sent to all customers. As such, it did not bestow on Corinthian nor other customers the power to form a binding contract for the sale of one thousand, or, for that matter, one million vials of vaccine.[9]
Thus, as a matter of law, the first offer was made by Corinthian when it phoned in and subsequently confirmed its order for 1,000 vials at the lower price. The next question, then, is whether Lederle ever accepted that offer.
Under the Code, an acceptance need not be the mirror-image of the offer. U.C.C. § 2-207. However, the offeree must still do some act that manifests the intention to accept the offer and make a contract. Under § 2-206, an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances. The first question regarding acceptance, therefore, is whether Lederle accepted the offer prior to sending the 50 vials of vaccine.
The record is clear that Lederle did not communicate or do any act prior to shipping the 50 vials that could support the finding of an acceptance. When Corinthian placed its order, it merely received a tracking number from the Telgo computer. Such an automated, ministerial act cannot constitute an acceptance. See, e.g., Foremost Pro Color, Inc. v. Eastman Kodak Co., 703 F.2d 534, 539 (9th Cir.1983) (logging purchase orders as received did not manifest acceptance); Southern Spindle & Flyer Co. v. Milliken & Co., 53 N.C.App. 785, 281 S.E.2d 734, 736 (1981) (seller's acknowledgement of receipt of purchase order did not constitute assent to its terms). Thus, there was no acceptance of Corinthian's offer prior to the deliver of 50 vials.
The next question, then, is what is to be made of the shipment of 50 vials and the accompanying letter. Section 2-206(b) of the Code speaks to this issue:
[A]n order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods, but such a shipment of non-conforming goods does not constitute an acceptance if the seller seasonably notifies the buyer that the shipment is offered only as an accommodation to the buyer.

§ 2-206 (emphasis added). Thus, under the Code a seller accepts the offer by shipping goods, whether they are conforming or not, but if the seller ships non-conforming goods and seasonably notifies the buyer that the shipment is a mere accommodation, then the seller has not, in fact, accepted the buyer's offer. See Greenberg, U.C.C. Article 2 § 5.5 at 53.
In this case, the offer made by Corinthian was for 1,000 vials at $64.32. In response, Lederle Labs shipped only 50 vials at $64.32 per vial, and wrote Corinthian indicating that the balance of the order would be priced at $171.00 per vial and would be shipped during the week of June 16. The letter further indicated that the buyer could cancel its order by calling Lederle Labs. Clearly, Lederle's shipment was non-conforming, for it was for only 1/20th of the quantity desired by the buyer. See § 2-106(2) (goods or conduct are conforming when they are in accordance with the obligations under the contract); Michiana Mack, Inc. v. Allendale Rural Fire Protection, 428 N.E.2d 1367, 1370 (Ind.App.1981) (non-conformity describes goods and conduct). The narrow issue, then, is whether Lederle's response to the offer was a shipment of non-conforming goods not constituting an acceptance because it was offered only as an accommodation under § 2-206.
An accommodation is an arrangement or engagement made as a favor to another. *611 Black's Law Dictionary (5th ed. 1979). The term implies no consideration. Id. In this case, then, even taking all inferences favorably for the buyer, the only possible conclusion is that Lederle Labs' shipment of 50 vials was offered merely as an accommodation; that is to say, Lederle had no obligation to make the partial shipment, and did so only as a favor to the buyer. The accommodation letter, which Corinthian is sure it received, clearly stated that the 50 vials were being sent at the lower price as an exception to Lederle's general policy, and that the balance of the offer would be invoiced at the higher price. The letter further indicated that Lederle's proposal to ship the balance of the order at the higher price could be rejected by the buyer. Moreover, the standard terms of Lederle's invoice stated that acceptance of the order was expressly conditioned upon buyer's assent to the seller's terms.
Under these undisputed facts, § 2-206(1)(b) was satisfied. Where, as here, the notification is properly made, the shipment of nonconforming goods is treated as a counteroffer just as at common law, and the buyer may accept or reject the counteroffer under normal contract rules. 2 W. Hawkland, Uniform Commercial Code Series § 2-206:04 (1987).
Thus, the end result of this analysis is that Lederle Lab's price quotations were mere invitations to make an offer, that by placing its order Corinthian made an offer to buy 1,000 vials at the low price, that by shipping 50 vials at the low price Lederle's response was non-conforming, but the nonconforming response was a mere accommodation and thus constituted a counteroffer. Accordingly, there being no genuine issues of material fact on these issues and the law being in favor of the seller, summary judgment must be granted for Lederle Labs.

B. Any Contract Formed Would Have Been Governed By Lederle's Conditions:

Additionally, assuming arguendo that a contract for the sale of 1,000 vials were somehow formed, it is clear that Lederle Labs would still prevail for two related reasons. First, it is undisputed that as a result of the 1984 litigation between the parties, Corinthian agreed to be bound by the seller's terms and conditions in effect as of the date of any order. Mr. Eaton, as president of Corinthian, signed the written release in that 1984 litigation; thus he and his company are charged with knowledge of its contents. Walb Construction Co. v. Chipman, 202 Ind. 434, 175 N.E. 132, 135 (1931) (parties to a contract are deemed to know the contents of the agreement); National Steel Corp. v. L.G. Wasson Coal Mining Corp., 338 F.2d 565, 567-68 (7th Cir.1964) (same under Kentucky law); Terry Fashions, Ltd. v. Ultracashmere House, Ltd., 462 N.E.2d 252, 255 (Ind.App. 1984) (same under New York law).
Throughout the parties' relationship, Lederle's terms and conditions, as set forth in its price lists and its invoices, remained the same. The price of all products remained subject to change at any time, and the seller retained the right to allocate its product as it deemed proper without incurring liability for failure to perform any contract. Under a separate contractual agreement compromising a similar dispute, Corinthian agreed to be bound by these conditions. Thus, even if a contract were ever formed in this case, Lederle retained the defenses set forth in its standard conditions.
Second and similarly, the invoice sent by Lederle clearly stated that the transaction would be governed by Lederle's terms and conditions, and that acceptance of the order was expressly made conditional on the buyer's assent thereto. Lederle thus followed the prophylactic language of § 2-207 and insulated itself from any other conditions (such as the low price demanded by Corinthian) that a buyer might attempt to impose. Again, even if a contract were formed, it remained bound by Lederle's conditions giving the seller the price and allocation defenses.
For all these reasons, the defendant's motion for summary judgment is granted.
IT IS SO ORDERED.
NOTES
[1] The material facts relayed are undisputed, are determined to be admissible under the Federal Rules of Evidence, and are taken favorably for the non-movant plaintiff on this summary judgment motion. The facts in this case come from the depositions of Lyman Eaton and James Farris, plaintiff's answers to interrogatories, the affidavits of John Kelly and Anthony La Luna, and various documents, the authenticity of which is not in dispute.
[2] Mr. Eaton, the president of Corinthian, admits in his deposition that Corinthian and Criterion Pharmacy are in essence the same entity, (Depo. at 5-6). There is no dispute that the "Tri Immunol" referred to in the 1984 litigation is Lederle's trade name for DPT. (Depo. at 31). The Court will use "DPT" throughout this opinion for simplicity.
[3] See Eaton depo. at pp. 11-14, 74. Although he was aware of their existence, Corinthian's president never read the conditions on the forms. (Depo. at 69).
[4] See Farris depo. at 22.
[5] See Farris depo. at 23, 61.
[6] See Farris depo. at 60; Eaton depo. at 34-35; Defendant's Exhibit 10 to Eaton deposition.
[7] The Amended Complaint vaguely seeks damages, costs, and attorney's fees. The undisputed facts show that Corinthian did not have specific contracts for resale of the vaccine lined up at the date of its order. Not surprisingly, then, plaintiff now merely seeks specific performance for the 950 vials of DTP that were not delivered. See Plaintiff's Brief at 19 ("[Corinthian] seeks only specific performance.").
[8] The Court notes that Lederle's standard terms state that any contract is to be construed under New Jersey law. For purposes of this motion, because it is not established that there is any difference between New Jersey's and Indiana's interpretation of the Code, the Court will use Indiana U.C.C. decisions for simplicity.
[9] Nor is there any course of dealing that can support the existence of an offer by Lederle to Corinthian.