The **BERGQUIST COMPANY**

v.

**SUNROC CORPORATION and American Arbitration Association.**

Civ. A. No. 90–6153.

United States District Court,
E.D. Pennsylvania.

Nov. 15, 1991.

Thomas P. Wagner, Rawle & Henderson, Philadelphia, Pa., for plaintiff.

Glenn A. Harris, Levin & Hluchan, Voorhees, N.J., for defendants.

## OPINION AND ORDER

DITTER, District Judge.

This is a contract dispute over whether or not an arbitration clause appearing on the back of the buyer's purchase order is part of the agreement between the seller and the buyer. After the product sold to the buyer failed to live up to the buyer's expectations, the buyer filed for arbitration. The seller moved to enjoin the arbitration. I denied the seller's motion for a preliminary injunction, because it had failed to show a likelihood of success on the merits and irreparable harm if the arbitration went forward as scheduled. At the arbitration, the buyer was awarded substantial damages. The buyer now moves to confirm the award and the seller moves to vacate the award. Both parties have

also filed cross-motions for summary judgment. They have agreed to have me first resolve the cross-motions. Based upon the evidence introduced at the preliminary injunction hearing, the parties' briefs, additional exhibits, and oral argument, I will deny in part and grant in part the cross-motions for summary judgment and will direct that a jury determine the limited issues I will discuss below.

### I. Facts

Plaintiff, The Bergquist Company, is a manufacturer of various products used for the purpose of transferring heat. One of those products is a heat transfer tape called the "Q Pad II." Defendant, Sunroc Corporation, is a manufacturer of stainless steel water coolers. One of its coolers dispenses both hot and cold water. The hot water is heated in a tank surrounded by a metal heating element. Sunroc purchased a large quantity of Bergquist's Q Pad II to use in its water coolers to facilitate the transfer of heat from the heating element to the tank. Sunroc claims the Q Pad II was defective and emitted a foul odor which caused Sunroc to recall some of its water coolers.

Sunroc first learned of Bergquist's heat transfer products in an advertisement Bergquist placed in a trade journal. In response to the advertisement, a Sunroc engineer, Daniel McShane, telephoned Bergquist to request more detailed information. McShane asked for a copy of Bergquist's design guide, a package of information and product samples. Bergquist sent the design guide to McShane.

McShane placed a second phone call requesting additional information and samples. McShane spoke with Robert Scheiber, one of Bergquist's application engineers. McShane told Scheiber what types of products he was looking for and for what purpose he needed the tape. Scheiber described the variety of products available and he sent to McShane additional samples of the Q Pad II.

McShane tested the Q Pad II and determined it would be suitable for use in Sunroc's water coolers. He then sent to Scheiber engineering specifications and a drawing of the tape Sunroc needed for its water cooler. McShane telephoned Bergquist and requested a price quotation.

On March 8, 1988, Bergquist telefaxed a price quotation form to Sunroc. The price quotation form provides a description of the product to be sent, a listing of the available quantities and prices for each amount, a die charge, a delivery date, and shipping terms. It opens with "Quotation from The Bergquist Company. When ordering refer to our quotation. Thank you for your inquiry. We quote as follows." At the bottom, it states: "This quotation is offered for your acceptance within 30 days and is subject to material availability and price in effect at time of shipment unless otherwise noted. Your order must conform to this quotation and refer to quotation No. shown above.... Your order for these items would be appreciated. Thank you."

Sometime later that same day, Sunroc's purchasing manager, Jerry Joyce, telephoned Scheiber at Bergquist. Neither Joyce nor Scheiber remembers the details of their conversation, but they assume Joyce informed Scheiber that he was calling regarding the purchase of 25,000 units of the tape at various delivery dates. He asked Scheiber to confirm the price per unit of the tape and the delivery dates, which Scheiber did. Joyce then gave Scheiber Sunroc's purchase order number for the goods, no. 34754. Joyce testified at the arbitration hearing that he generally considered orders made over the phone to a vendor "placed but not confirmed."

Ten days after the phone call, Joyce sent purchase order number 34754 to Bergquist. It is marked with a "confirming" stamp and Scheiber's name is typed just below the stamp. The purchase order lists the requested product, the quantity, delivery dates, and the price. The price is one half a cent less than that provided on the price quotation.[1] The purchase order lists:

1. After delivery and acceptance of the tapes, Sunroc paid the price listed on the price quota-

"please supply the following subject conditions on reverse side." The reverse side lists a number of "additional terms and conditions applying to this purchase order." It states:

> The Seller, by his acceptance of this order, implies the unconditional acceptance of all of the following conditions....
>
> *ARBITRATION* Any controversy or claim arising out of or relating to this contract or the breach thereof shall be settled by arbitration in accordance with the Rules of the American Arbitration Association and judgment upon the award rendered by the Arbitrator(s) may be entered in any Court having jurisdiction thereof.

An acceptance copy of the purchase order was also sent to Bergquist for its signature and return to Sunroc. No one at Bergquist read, signed, or returned the acceptance copy. No one at Sunroc requested the return of the acceptance copy.

The tapes referred to on the purchase order were shipped on or about the dates referred to in that document and were paid for by Sunroc.

Nearly ten days after each shipment, Bergquist sent an invoice to Sunroc. The invoice referenced Sunroc's purchase order number and included the relevant terms of their agreement. The invoice provided the following "terms and conditions" on the reverse side:

> 4. DELIVERIES. The seller will make every effort to fill orders within the time promised. Under no circumstances will the seller assume responsibility or liability for any damage or claims resulting from delays in delivery schedule. Date of shipment shown on our quotation form or promised at any time during the life of the order is based on the seller's best judgment at that time but may be subject to changing conditions, in many cases beyond the seller's reasonable control. No liability on the seller's part shall result in any case.
>
> 6. QUOTATIONS. Stenographical or clerical errors subject to correction. The

seller reserves the right to revise any prices quoted by the seller without notice at any time prior to the acceptance of an order by the seller. Material price fluctuations are subject to change in accordance with the price of the material on the day an order is accepted by the seller.

> 10. ACCEPTANCE OF ORDERS. All orders and sales contracts are subject to written approval and acceptance by the seller and are not binding until approved or accepted by the seller. Any terms which are in conflict with these terms and conditions shall not be binding upon the seller unless accepted in writing by the seller. In case of conflict not expressly accepted by the seller, the terms and conditions of sale herein shall be considered as superseding terms stated in the buyer's purchase order or contract.
>
> 11. WARRANTY. All goods sold under any order are warranted for 90 days to be free from defects in material and workmanship, and this express warranty is in lieu of and excludes all other warranties, express or implied, by operation of law or otherwise. Seller's only obligation is to replace products proven to be defective in material or workmanship within 90 days after shipment. It is the responsibility of the buyer to determine the suitability and application of the product. The manufacturer will not be held liable for any injury, loss or damage whatsoever resulting in the use or inability to use the product. No warranties or statements which are not contained herein will be binding upon the manufacturer unless in an agreement signed by officers of seller.

On or about July 29, 1988, Joyce telephoned Bergquist about the purchase of additional tapes. He spoke with Gina Henton–Olsen, a Bergquist sales representative. Joyce informed Henton–Olsen that he needed 10,000 more units of the tape, at various delivery dates, and asked her to confirm the price per unit and the delivery dates. She did so. Joyce gave her a pur-

---

tion and not on the purchase order. There is no evidence from which to infer why Sunroc neglected to include the additional half cent and why Sunroc paid the greater price.

chase order number, no. 35666. Henton–Olsen made a contemporaneous note of the conversation. It shows a date, Sunroc's and Joyce's name, Sunroc's purchase order number, Bergquist's part number, the quantity requested, the delivery dates, and the price (twenty-nine cents). Neither Joyce nor Henton–Olsen recalls any other details of the conversation. In fact, Henton–Olsen does not remember the call and her testimony was based upon her present interpretation of her note.

On August 1, 1988, Sunroc mailed purchase order 35666 to Bergquist. It, too, included an acceptance copy and the arbitration provision on the reverse side. No one at Bergquist read, signed, or returned the acceptance copy. No one at Sunroc requested the return of the acceptance copy of the purchase order.

The tapes referred to on the purchase order were shipped on or about the dates referred to in that document and were paid for by Sunroc.

On February 13, 1989, Joyce telephoned Scheiber concerning Sunroc's desire to purchase additional tapes from Bergquist. Joyce and Scheiber discussed a new price arrangement and they eventually agreed Sunroc would purchase 21,000 units at twenty-one cents a unit; if Sunroc made payment within ten days of shipment, it would receive a two percent discount; and Sunroc had thirty days to make a final payment. Joyce gave Scheiber Sunroc's purchase order number, no. 37170. Other than the discussion about the price and payment terms, neither Joyce nor Scheiber recall any other details about their conversation.

Sunroc sent its purchase order number 37170 to Bergquist. It has the same arbitration provision on the reverse side. An acceptance copy was provided to Bergquist. No one at Bergquist read, signed, or returned the acceptance copy. No one at Sunroc requested that the acceptance copy be returned.

The tapes were shipped on the approximate dates listed in the purchase order, but were sent back after Sunroc learned of the odor problems coming from tapes received

from Bergquist as part of the first two transactions.

After returning the goods relating to the third purchase order, Sunroc filed an arbitration demand with the defendant American Arbitration Association ("AAA"). Bergquist was notified of the demand for arbitration on July 12, 1990. Bergquist's in-house counsel informed the AAA that:

> The Bergquist Company demands arbitration in Minneapolis, Minnesota. At the time of writing this letter I have not had the opportunity to research whether there is an arbitration agreement or not, but to the writer's best knowledge there is no arbitration agreement contained in any agreements as noted in the Demand for Arbitration. This matter will have to be determined by further investigation.

The parties each filed documents intended to persuade the AAA to schedule the arbitration in their local area. The AAA selected Philadelphia as the site for the arbitration and gave the parties the opportunity to select an arbitrator. Bergquist retained Philadelphia counsel to represent it in the arbitration. Bergquist's present counsel stated in a letter to the AAA dated September 18, 1990:

> Our client, the Bergquist Corporation [sic], wishes an additional extension of time in which to submit its lists of arbitrators because we believe that this matter is not properly subject to arbitration. You told us that you are not in a position to adjudicate that question and you also could not give us an additional extension to time without the agreement of our opponent. We contacted ... [Sunroc's counsel] ..., but he declined to agree that we could have an additional extension to submit the list of arbitrators.
>
> Accordingly, we are submitting the enclosed list of arbitrators in protest, and without waiving our position that this matter is not properly subject to arbitration....

Before an arbitrator was selected, Bergquist filed the instant complaint. The complaint contains four counts for declaratory relief. The requested declarations are as follows: 1) that no valid arbitration

agreement exists; 2) that if one exists, it does not cover Sunroc's products liability claim; 3) that if one exists and covers products liability, it nevertheless excludes Sunroc's strict liability and negligence claims; and 4) that any award from an arbitration must be limited to the cost of replacement goods, excluding lost profits and consequential damages. Bergquist additionally sought to enjoin the scheduled arbitration. I denied this last request, since Bergquist had not shown either that it would likely succeed on the issue of arbitrability, or that it would be irreparably harmed if arbitration went forth as scheduled. The arbitration took place in early 1991, and the arbitrator found for Sunroc. The parties have now returned to this forum. Sunroc moves for confirmation of the award; Bergquist seeks the vacation of the award. Both parties also filed cross-motions for summary judgment which address the merits of Bergquist's complaint. They have asked that I address the summary judgment motions first.

## II. Step–Saver Data Systems, Inc. v. Wyse Technology

After full briefing of the motions for summary judgment, I permitted the parties to argue their positions. Subsequent to that argument, the Third Circuit issued its decision in *Step–Saver Data Systems, Inc. v. Wyse Technology,* 939 F.2d 91 (3d Cir. 1991). After the opinion was released, I requested the parties submit additional memoranda addressing *Step–Saver* and its relation to the issues before me.

The *Step–Saver* case is remarkably similar to this one. It directly controls two of the five questions (the conditional acceptance and warranty questions) and provides guidance as to how to analyze two others (the arbitration provision and price quotation questions). In *Step–Saver,* on a number of occasions, Step–Saver, the buyer, telephoned defendant, The Software Link, Inc. ("TSL"), the seller, and placed an order for copies of TSL's computer program. While on the telephone, TSL accepted the order and promised to ship the programs. After the telephone call, Step–Saver sent a purchase order, detailing the items to be purchased, their price, and shipping and payment terms. With shipment, TSL sent an invoice with similar terms. Step–Saver and TSL did not discuss a warranty disclaimer and the purchase order and invoice are silent on that point. On the top of TSL's packaging box which contained the program, TSL printed a license which included a warranty disclaimer, a limitation on remedies and damages, an integration clause, and a clause attempting to condition the buyer's acceptance to the terms of the license.[2] TSL sought to have the terms on the box-top become part of the agreement between Step–Saver and TSL.

The *Step–Saver* court first determined a contract had been formed at some point in the relationship between Step–Saver and TSL. *Step–Saver,* 939 F.2d at 98 and 100–01. "The dispute is, therefore, not over the existence of a contract, but the nature of its terms." *Id.* at 98. In that circumstance, the court decided Uniform Commercial Code ("UCC") § 2–207[3] provided the

**2.** The *Step–Saver* court stated:
(2) The box-top license, in detail and at some length, disclaims all express and implied warranties except for a warranty that the disks contained in the box are free from defects.
(3) The box-top license provides that the sole remedy available to a purchaser of the program is to return a defective disk for replacement; the license excludes any liability for damages, direct or consequential, caused by the use of the program.
(4) The box-top license contains an integration clause, which provides that the box-top license is the final and complete expression of the terms of the parties's agreement.
(5) The box-top licenses states: "Opening this package indicates your acceptance of these

terms and conditions. If you do not agree with them, you should promptly return the package unopened to the person from whom you purchased it within fifteen days from date of purchase and your money will be refunded to you by that person.
*Step–Saver,* 939 F.2d at 96–97.

**3.** Section 2–207 provides:
Additional Terms in Acceptance or Confirmation.
(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly

means to determine what the terms of the contract were.

The court next addressed TSL's contention that its box-top license should be considered a conditional acceptance under UCC § 2-207(1). It held a conditional acceptance will only be found where the offeree demonstrates an "unwillingness to proceed with the transactions unless its additional terms were incorporated into the parties's agreement." [4] *Id.* at 103. TSL did not meet that test. Its box-top was not a conditional acceptance.

TSL also argued the repeated use of the box-top license incorporated its terms into the contract. This "course of dealing" argument was rejected by the Third Circuit. *Id.* at 103–04. It held:

> the repeated sending of a writing which contains certain standard terms, without any action with respect to the issues addressed by those terms, cannot constitute a course of dealing which would incorporate a term of the writing otherwise excluded under § 2–207.

*Id.* at 104.

Finally, the Third Circuit concluded "that adding the disclaimer of warranty and limitation of remedies provisions from the box-top license would, as a matter of law, substantially alter the distribution of risk between Step–Saver and TSL." *Id.* at 105. Inclusion of the warranty disclaimer and limitation of remedies provisions would have materially altered the parties' agreement; therefore, they could not become

part of the contract under section 2–207(2)(b). The court referred to UCC § 2–207, comment 4, for its definition of those terms that "materially alter" a contract. *Id.* at 104 n. 44. Terms which work a "surprise or hardship if incorporated without express awareness by the other party" are material alterations. *Id.* (quoting UCC § 2–207, comment 4).

### III. Issues

Guided by the *Step–Saver* analysis, I conclude Bergquist and Sunroc reached three agreements to sell and buy the Q Pad II. More difficult is knowing what the terms of these agreements were. Price, quantity, payment, and delivery provisions were clearly part of the contracts. Whether other possible terms, such as the arbitration clause, the warranty disclaimer, and the limitation on remedies were also contract provisions depends on whether they would materially alter the basic agreements. If they would not, they must be included in the agreements, because no party filed a proper and timely objection to them. If they would alter the contracts, I must engage in the traditional, contract analysis, *i.e.*, finding the "offer" and "acceptance," an analysis which the *Step–Saver* court did not need to make. Under the circumstances here, these terms could become part of the agreements if the document which includes each of them is found to be an offer rather than an acceptance or a written confirmation. Therefore,

made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

    (a) the offer expressly limits acceptance to the terms of the offer;

    (b) they materially alter it; or

    (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with

any supplementary terms incorporated under any other provisions of the Act.

4. I question whether under this test it would be possible for an offeree to prove a conditional acceptance if it performs its part of the bargain. It would seem that once it is determined a contract exists based upon the parties' performances, no conditional acceptance could ever be found. In order to show a conditional acceptance, a party must immediately demonstrate its unwillingness to proceed with the transaction. Once a party proceeds with performance, by definition, he expresses a willingness to go forward which defeats his conditional acceptance contention. Perhaps the only way a conditional acceptance could be demonstrated in the face of performance is if the offeree believes incorrectly that the offeror accepted the additional terms, when, in fact, it has not agreed to those terms.

I must consider whether the price quotation was an offer and whether the purchase order was a counter-offer.

Bergquist's counts II and III seek to limit the scope of the arbitration, if it is determined that arbitration was appropriately ordered. The success of these counts will depend on the language of the arbitration clause. Finally, I must decide if arbitration was otherwise in order because the parties agreed to submit their dispute to arbitration after it arose.

There are seven relevant questions that need be answered:

1. Under section 2–207 of the UCC,[5] would the arbitration provision printed on the reverse side of the Sunroc's purchase order materially alter the parties' basic agreement?

2. Does the arbitration provision, if it is part of the agreement, allow for the arbitration of Sunroc's products liability, strict liability, and negligence claims?

3. Under section 2–207 of the UCC would the warranty and damages limitations appearing on the reverse side of Bergquist's invoice materially alter the parties' basic agreement?

4. Is the price quotation, the initial document sent by Bergquist to Sunroc, an offer as defined in the UCC or is it merely an invitation to submit offers?

5. If the price quotation is an offer, is Sunroc's purchase order a counter-offer or a conditional acceptance under the UCC?

6. Did the parties reach an oral agreement for each transaction?

7. Did Bergquist agree by subsequent writing to submit this dispute to arbitration?

The first and fourth questions cannot be decided on a motion for summary judgment and must be left for a jury to determine.

The other questions are ripe for resolution at this stage of the proceedings.[6]

*IV. Question 1: The Materiality of an Arbitration Provision.*

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, is the point of departure for deciding the first issue before me: did the parties contract to arbitrate disputes that arose between them? The Act and the federal law that has developed around it "comprise generally accepted principles of contract." *Genesco Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 845 (2d Cir.1987). Under this contract law approach to the arbitration question, the first rule is that no party can be forced into arbitration unless he has agreed to go there. *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986). It is the court's responsibility to determine if a valid arbitration agreement exists between the parties and if the specific dispute falls within the scope of that agreement. *Id.* at 649, 106 S.Ct. at 1418–19. Section 4 of the FAA provides a court should not order arbitration unless it is "satisfied that the making of the agreement for arbitration ... is not in issue." If the making of the agreement is in issue, then "the trial court shall proceed summarily to the trial of that issue." 9 U.S.C. § 4. *See Par–Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir.1980). "Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement." *Par–Knit*, 636 F.2d at 54.

As I noted above, Bergquist and Sunroc reached three agreements concerning the sale and purchase of heat tapes. The question is whether or not the inclusion of an arbitration provision would mate-

---

**5.** It is unnecessary to decide whether Pennsylvania or Minnesota law applies in this case. Both states have adopted the UCC and more specifically sections 2–206 and 2–207 of the Code. I will simply refer to the UCC section rather than the appropriate state codification.

**6.** Actually, Bergquist briefed an eighth issue concerning the arbitrator's conduct during the arbitration. Bergquist did not raise this issue during oral argument. I will reserve judgment on that question until after the trial as it is only relevant if the jury decides the matter is arbitrable and was properly sent to arbitration.

rially alter the parties' agreements. If the arbitration clause was not a material alteration it became part of the contracts because Bergquist did not seasonably object to its inclusion.[7]  UCC § 2-207(2)(c). If it was a material alteration it could only become a part of the contract if Bergquist manifested its assent to its inclusion.[8]  A material term is one which would result in " 'surprise or hardship if incorporated without express awareness by the other party.' "  *Step–Saver*, 939 F.2d at 104 n. 44 (quoting UCC § 2-207, comment 4). On the limited record before me, I cannot say whether or not the incorporation of this arbitration provision would amount to a material alteration of the basic agreements between Bergquist and Sunroc. The cross-motions for summary judgment will be denied as to this issue.

■ Bergquist contends the so-called "New York" rule cases which find an arbitration provision to be a *per se* material alteration, *see, e.g., Diskin v. J.P. Stevens & Co., Inc.*, 836 F.2d 47 (1st Cir.1987); *Supak & Sons Mfg. Co., Inc. v. Pervel Industries, Inc.*, 593 F.2d 135 (4th Cir. 1979); *Universal Plumbing & Piping Supply, Inc. v. John C. Grimberg Co., Inc.*, 596 F.Supp. 1383 (W.D.Pa.1984);

*Schubtex, Inc. v. Allen Snyder, Inc.*, 49 N.Y.2d 1, 399 N.E.2d 1154, 424 N.Y.S.2d 133 (1979); *Matter of Marlene Industries Corp. (Carnac Textiles)*, 45 N.Y.2d 327, 380 N.E.2d 239, 408 N.Y.S.2d 410 (1978), should apply in this case. Sunroc argues the more modern approach which favors a case-by-case materiality determination based upon a thorough examination of the surprise and hardship elements, *see, e.g., Trans–Aire International, Inc. v. Northern Adhesive Co.*, 882 F.2d 1254 (7th Cir. 1989); *Pervel Industries, Inc. v. T M Wallcovering, Inc.*, 871 F.2d 7 (2d Cir.1989); *N & D Fashions, Inc. v. DHJ Industries, Inc.*, 548 F.2d 722 (8th Cir.1976); *Dale R. Horning Co., Inc. v. Falconer Glass Industries, Inc.*, 730 F.Supp. 962 (S.D.Ind. 1990); *Dale R. Horning Co., Inc. v. Falconer Glass Industries, Inc.*, 710 F.Supp. 693 (S.D.Ind.1989) (on summary judgment), is far superior to the New York rule. Because the modern approach is more in tune with the UCC and with relevant Third Circuit precedent, particularly *Step–Saver*, I will adopt it over the New York rule.

The genesis of the New York rule cases is the *Marlene* decision of the New York Court of Appeals. In *Marlene*,[9] the buyer retained the seller's form, which contained the arbitration provision, without signing

---

7. Whether Sunroc's purchase order is considered an offer, an acceptance of an offer, or a written confirmation of an acceptance or of an oral agreement, the UCC permits non-material terms to be made part of the contract unless an objection is noted. This fact underlies the *Step–Saver* court's emphasis on materiality rather than on the more traditional search for an offer and acceptance. Bergquist did not object to the purchase order's arbitration provision at any time during the three transactions. Its current resistance to arbitration is not a valid objection under the UCC; it is untimely. Moreover, Bergquist's invoice is silent as to arbitration and could not be considered an objection to the arbitration provision in Sunroc's purchase order.

8. More specifically, the arbitration provision would still be included in the agreements if Sunroc's purchase order is considered as the offer. This, however, is dependent upon the price quotation's not being the offer and upon no oral agreement having been reached over the telephone between Joyce and Scheiber or Joyce and Henton–Olsen. As I will discuss below, I cannot conclude, based on the record before

me, whether the price quote is an offer, *see infra* at 1248–49, but it is clear no oral agreement was reached, *see infra* at 1250–51. If Sunroc's purchase order was the offer, that provision was part of the contract from the inception and Bergquist accepted that term by making shipment.

9. *Marlene*, like many of the cases specifically concerning the materiality of an arbitration provision, is a case arising from a dispute in the textile industries. *See also Diskin, Pervel; Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840 (2d Cir.1987); *N & D Fashions; Supak; Schubtex; Matter of C.M.I. Clothesmakers, Inc.*, 85 Misc.2d 462, 380 N.Y.S.2d 447 (Sup.Ct.1975); *Frances Hosiery Mills, Inc. v. Burlington Industries, Inc.*, 285 N.C. 344, 204 S.E.2d 834 (1974). The use of arbitration provisions in the textile industry is apparently widespread. Despite this extensive use, the New York rule cases held its inclusion was a material alteration. *See Diskin*, 836 F.2d at 50–51. More modern cases find the frequent use of an arbitration provision refutes the argument that the nonassenting party was surprised by the provision. *See infra* at 1245. *Genesco*, 815 F.2d at 846.

it. The court purported to rest its decision upon the UCC. The court placed special emphasis on New York precedent which had found "parties to a commercial transaction 'will not be held to have chosen arbitration as the forum for resolution of their disputes in the absence of an express, unequivocal agreement to that effect; absent such an explicit commitment neither party may be compelled to arbitrate.' " *Marlene*, 45 N.Y.2d at 333, 408 N.Y.S.2d 410, 380 N.E.2d 239 (quoting *Matter of Acting Sup't. of Schools of Liverpool Central School District*, 42 N.Y.2d 509, 512, 399 N.Y.S.2d 189, 369 N.E.2d 746). The sole justification provided by the court for its decision is "by agreeing to arbitrate a party waives in large part many of his normal rights under the procedural and substantive law of the State, and it would be unfair to infer a significant waiver on the basis of anything less than a clear indication of intent." *Id.*, 45 N.Y.2d at 334, 408 N.Y.S.2d 410, 380 N.E.2d 239. The court did not explain what it meant by "normal rights." It also did not address whether the widespread use of the arbitration provision in the textile industry should have alerted the buyer to its presence. Later New York rule cases do not add anything else in the way of explanation for their holdings.

These cases, then, do not follow the UCC. The UCC uses the "surprise" or "hardship" language as definitional terms. UCC § 2–207, comment 4. The New York rule cases merely assume, without explanation, that a hardship would result from arbitration, and completely ignore the surprise element. Moreover, a *per se* rule is absolutely contrary to the UCC's special emphasis on the particular circumstances surrounding each contractual relationship. The New York rule cases do not leave room for an examination of the parties' course of dealing, trade usage, or, for that matter, any other facts which would shed light on the materiality question. A *per se* rule cannot be justified under the UCC. Similarly, the Third Circuit's reference in *Step–Saver* to the surprise or hardship elements in comment 4, *Step–Saver*, 939 F.2d at 104 n. 44, and its emphasis on the effect the warranty disclaimer had upon the distribution of risk between the parties, *i.e.*, the hardship that would have been worked upon Step–Saver, *id.* at 105, undercut the viability of the New York rule in this circuit.

■ The modern, case-by-case approach which focuses on the degree of surprise or hardship that is imposed upon the nonassenting party is a better reasoned method. Under that analysis,

> whether an additional term materially alters a contract should not be determined upon a summary judgment motion because the inquiry is merely part of the process to ascertain the parties' bargaining intent.... However, summary judgment may be appropriate when the parties cannot honestly dispute that a term would result in surprise or undue hardship unless both parties agree to its inclusion.

*Trans–Aire*, 882 F.2d 1254.[10]

On the limited record before me, I cannot determine if the arbitration provision surprised Bergquist. Bergquist has not satisfied its burden of showing surprise; however, it is possible that it can convince a jury that it was, in fact, surprised by the assertion that its agreement with Sunroc contained an arbitration provision. *Dale Horning*, 730 F.Supp. at 966 n. 2.[11] Bergquist contends it was unaware an arbitration provision appeared upon the reverse side of the purchase order. It avers the purchase order was not read by anyone at

---

**10.** *See also Transamerica Oil Corp. v. Lynes, Inc.*, 723 F.2d 758, 765 (10th Cir.1983) ("[I]ssue of whether a term materially alters the contract for the purposes of § 2–207(2)(b) is a question of fact that must be determined in light of the facts of the case and the parties' expectations.").

**11.** "The burden of showing surprise appears to be on the nonassenting [party] ..., for § 2–207 states that between merchants, such terms become a part of the contract unless they materially alter it. In this case, then, if the buyer presented no evidence on surprise, the Code would add the presumption that the term is part of the agreement. Th[at party] ... thus bears the burden of proof on this matter...." *Dale Horning*, 730 F.Supp. at 966 n. 2.

its headquarters until well after the transactions were completed. It alleges the arbitration provision was not discussed at any time. While Sunroc agrees the arbitration provision was not discussed, it argues the arbitration provision is conspicuously referenced on the front side of the purchase order and Bergquist did or should have known of its existence.

This is a close factual question. It appears Bergquist was not initially made aware by Sunroc that its purchase order contained an arbitration clause, but the purchase order clearly and conspicuously alerts the seller that additional terms appear on the reverse side. It may be Bergquist should have known an arbitration clause appeared on the back of the purchase order. If that be the case, Bergquist will be bound by the arbitration provision.

At trial, it will be incumbent upon Bergquist to convince the jury that not only it did not know of the arbitration clause, but that it had no reason to know of it. As the *Dale Horning* court stated "[c]ourse of dealing and usage of trade . . . is properly invoked at this stage, for if the . . . [nonassenting party] . . . is generally aware that such limitations are imposed in the industry, the buyer cannot be heard to complain of surprise in any individual transaction." [12] 730 F.Supp. at 966. The transactional record between Bergquist and Sunroc gives rise to differing conclusions as to the materiality of the arbitration provision. Over the lengthy period of time between the initial contact and the final transaction, Bergquist and Sunroc may have had different beliefs and understandings as to the nature of their agreements. Neither Bergquist nor Sunroc has

introduced any evidence of trade usage, nor have they shown what Bergquist's practice is when it is a buyer rather than a seller. Bergquist may rely on an arbitration provision when it wears the other hat. In a nutshell, I cannot determine what the parties' expectations were at the time the transactions took place. I cannot tell with any degree of certainty whether or not the parties intended to include an arbitration provision in their agreements.

As for hardship, the relevant issues are whether the arbitration provision would impose "substantial economic hardship," *Trans–Aire*, 882 F.2d at 1262, on the nonassenting party or would "substantially alter the distribution of risk," *Step–Saver*, 939 F.2d at 105, between the parties. During the preliminary injunction phase of this case, I decided Bergquist had not shown it would be irreparably harmed if it was forced to proceed to arbitration. I concluded arbitration was a speedier, less expensive alternative to the courts and any negatives inherent the process were burdens both parties would bear equally.[13] For example, the limited appeal rights afforded under the FAA work imposes a burden on the loser at arbitration, whether it be plaintiff or defendant. Additionally, I found arbitration to afford the parties the unique opportunity of contributing to the arbitrator selection process. Thus, at that time I would have found forcing Bergquist to arbitration would not work a substantial economic harm upon it or substantially alter the distribution of risk between it and Sunroc. Nevertheless, I have since reconsidered and now find an honest dispute exists over the cost of sending Bergquist to arbitration that prevents my granting sum-

---

**12.** In *Step–Saver*, as I discussed *supra* at 1242, the court held the mere exchange of documents without a specific reference to the term in issue cannot constitute a course of dealing which would incorporate the term into the parties' agreement. *Step–Saver*, at 103–04. However, that holding is not as broad as it seems. The Third Circuit did not hold no evidence of the parties' transactions could be admitted. Rather, such evidence is admissible since it goes to prove a parties' intent to be bound by a particular contractual provision.

**13.** The *Trans–Aire* court stated:

It is clear that the term would impose no substantial hardship upon the nonassenting party. True, the term deprived the party of certain rights. However, for all practical purposes, the term had little effect upon the nonassenting party's economic welfare. That is, the nonassenting party still had an opportunity to prosecute or defend its interests albeit in a different forum.

882 F.2d at 1262.

mary judgment on this issue to either party.

On the side favoring arbitration are all the things I mentioned above. In addition, there are the benefits of a limited discovery to prevent the unnecessary protraction of litigation. In many instances the arbitrator is an expert in the particular field and can use his specialized understanding of the area to fashion an appropriate remedy. A court may be unable to appreciate the particular nuances of the trade and to create a remedy that takes those factors into account. Moreover, it is often easier to satisfy a judgment. Because of the limited appeal rights, appeals are less frequent and payment may sooner occur. There are many benefits to arbitration, all of which make it an attractive alternative to the courts.

On the other hand, there are some costs and risks that arise from arbitration. Those "normal rights" the *Marlene* court spoke of are significant. Arbitration eliminates the right to a jury trial. The forced attendance of uncooperative or geographically distant witnesses is difficult to obtain outside the courtroom. Unlike civil cases, arbitration does not let parties move to curtail or summarily end a suit. At arbitration, an unwilling party must defend the suit, frivolous or not. That party cannot stop the litigation before it comes to a head. Thus, it must incur the arbitration cost, whereas in the civil system motion practice may eliminate much of the trial expense. The right to present certain issues of law that are uniquely within the province of the judiciary, *e.g.*, constitutional or federal statutory questions, is reduced in arbitration. Similarly, the right to an appeal from an arbitration is so limited as to be unrecognizable. The grounds on which an appeal may be taken from an arbitration under the FAA, 9 U.S.C. § 10, are exceedingly restricted. The risk then of an incorrectly decided arbitration remaining uncorrected is far greater than that associated with the judiciary.

On the whole, I find the costs and benefits of arbitration to be in balance. However, the parties may have more to add. I will leave it to the jury to assess the parties' evidence on this question and to decide if forcing Bergquist to arbitration imposed unnecessary hardship.

In sum, the question of whether or not the arbitration provision appearing on the reverse side of Sunroc's purchase order materially altered an existing agreement between Sunroc and Bergquist must be submitted to a jury for resolution. I reject the *per se* approach of the New York rule cases and adopt the case-by-case method appearing in more recent decisions. I can not determine if Bergquist would have been surprised to find an arbitration provision to be part of its agreement with Sunroc. Additionally, the issue of whether Bergquist faced a hardship when forced into arbitration is not susceptible to resolution by summary judgment. Accordingly, the cross-motions for summary judgment will be denied on this ground.

## V. Question 2: Scope of the Arbitration Provision

Assuming, *arguendo*, arbitration is warranted, Bergquist seeks to limit the scope of the arbitration to exclude many of Sunroc's claims. At the arbitration, Sunroc presented claims for strict liability, products liability, and negligence. Whether Bergquist will succeed in its exclusion argument depends on the language of the arbitration clause. The arbitration clause on the reverse side of Sunroc's purchase order provides: "[a]ny controversy or claim arising out or relating to this contract or the breach thereof shall be settled by arbitration." There is a presumption of arbitrability. *PaineWebber Inc. v. Hartmann*, 921 F.2d 507 (3d Cir.1990). Only where a court can state with "positive assurance" a particular claim is outside the scope of the valid arbitration agreement should the claim be removed from arbitration. *Id.* at 511.

Here, the arbitration clause is broad enough to include Sunroc's products liability, strict liability, and negligence claims. Those claims arise out of the same facts that make up the breach of contract claim. The arbitration clause clearly covers *"any*

*controversy or claim."* Arbitration is not limited to breach of contract claims, but may include "any controversy arising under or relating to this contract." A products liability, strict liability, or negligence claim is within the broad scope of this arbitration clause. *See N & D Fashions, Inc. v. DHJ Industries, Inc.,* 548 F.2d 722, 728 (8th Cir.1976) (fraud and misrepresentation claims within scope of similarly worded arbitration clause). If an arbitration agreement is part of these contracts between Bergquist and Sunroc, Sunroc properly pursued its products liability, strict liability, and negligence claims at the arbitration. Summary judgment will be granted in favor of Sunroc and against Bergquist on counts II and III of Bergquist's complaint, which deal with the scope of permissible claims at arbitration.

### VI. Question 3: The Materiality of a Warranty Disclaimer and Limitation of Remedies Provision

■ Bergquist's count 4 seeks enforcement of the warranty disclaimer and limitation of remedies provisions contained in its invoice. It is clear under *Step–Saver* that those provisions are material alterations to the parties' basic agreements and were not part of them. *Step–Saver,* 939 F.2d at 105. The invoice is similar in language to the box-top license and cannot be distinguished on any other basis. Summary judgment will be granted in favor of Sunroc and against Bergquist on Bergquist's count 4.

### VII. Question 4: Was Bergquist's Price Quotation an offer or an Invitation to Submit Offers?

Employing a more traditional offer-acceptance analysis to determine the terms of the contracts here, Bergquist argues I should consider its price quotation an initial offer to sell which was accepted on each occasion by Sunroc's orders. Sunroc responds the price quotation was nothing more than an invitation to make offers to buy, which it made through submitting its purchase orders. Both parties argue their points strenuously because if Bergquist's price quotation was the offer, the arbitration provision in Sunroc's purchase orders became part of each contract, as long as it was not a material alteration.[14] If the Bergquist price quotation was not an offer, Sunroc's purchase orders with their arbitration provisions would be the offers, accepted by Bergquist's shipments unless oral agreements were reached on the telephone before each shipment.[15] Unfortunately, however, the price quotation is not clearly an offer or an invitation to accept offers. It is an ambiguous document. The other evidence of Bergquist's intent to be bound and Sunroc's understanding of the document is equivocal. All this creates a classic jury question.

■ An offer is "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Corinthian Pharmaceutical Systems, Inc. v. Lederle Laboratories,* 724 F.Supp. 605, 609 (S.D.Ind.1989) (quoting H. Greenberg, *Rights and Remedies Under U.C.C. Article 2,* § 5.2 at 50 (1987)). The general rule is price quotations are not offers, but rather are mere invitations to enter into negotiations or to submit offers. *Master Palletizer Systems, Inc. v. T.S. Ragsdale Co.,* 725 F.Supp. 1525, 1531 (D.Colo.1989), *aff'd* 937 F.2d 616 (10th Cir.1991); *Corinthian,* 724 F.Supp. at 609; *Maurice Electrical Supply Co., Inc. v. Anderson Safeway Guard Rail Corp.,* 632 F.Supp. 1082, 1087 (D.D.C.1986). A buyer's purchase order submitted in response to a price quotation is ordinarily considered the offer. *Master Palletizer,* 725 F.Supp. 1525. However, if detailed enough, a price quotation can amount to an offer which can be accepted. *Id.* at 1531; *Quaker State Mushroom v. Dominick's Finer Foods,* 635 F.Supp. 1281, 1284 (N.D.Ill.1986); *In re Chemtoy*

---

**14.** Section 2–207(2)(b) provides additional terms in an acceptance become part of an agreement unless they materially alter the contract or are rejected within a reasonable time.

**15.** *See supra* at 1244.

*Corp.*, 19 B.R. 475, 479 (Bankr.N.D.Ill. 1982).

But to do so, the offer must intend that the contract exist upon acceptance of the offer; that is, it must reasonably appear from the price quotation that assent to that quotation is all that is needed to ripen the offer into a contract.

*Quaker State*, 635 F.Supp. at 1284. Whether this price quotation is an offer is a question of fact that depends upon the parties' acts, their expressed intent, and the circumstances surrounding each transaction. *Maurice Electrical*, 632 F.Supp. at 1087.

Bergquist points out many factors which would support a finding that the price quotation is an offer. The price quotation was developed after some negotiation between the parties and after Sunroc had submitted its own specifications. This is not a situation where a price quote was unsolicited; rather, it was a specific response to McShane's request. The price quotation is detailed and includes a description of the product, a listing of various quantities at various prices, a die charge, delivery terms, and payment terms. The price quotation states: "This quotation is *offered for your acceptance* within 30 days...." (emphasis added). Thus, it appears Bergquist may have intended this price quotation to be an offer inviting acceptance. *Quaker State Mushroom*, 635 F.Supp. at 1284 n. 4. The "30 days" term usually informs the prospective buyer that the terms of the price quotation are irrevocable for a period of 30 days. *See Loranger Plastics Corp. v. Incoe Corp.*, 670 F.Supp. 145, 146 (W.D.Pa. 1987). Finally, the price paid by Sunroc for the first purchase Q Pad II was that listed in the price quotation rather than the lesser price appearing in Sunroc's purchase order. This certainly shows the parties had the price quotation in mind during the transac-

tion. These facts are all strong evidence the price quotation was an offer.

Yet there is also strong evidence the price quotation was not an offer. It is labelled "price quotation" in six places. The list of quantities and prices available for the Q Pad II resembles a menu rather than a specific offer to sell a particular quantity at a particular price. In that respect, the price quotation is like an invitation to accept Sunroc's offer to buy. Most important is the ambiguous small print at the bottom of the quotation. It states: "This quotation is offered for your acceptance within 30 days and *is subject to material availability and price in effect at time of shipment...." Id.* (emphasis added). This clause suggests Bergquist did not intend to be bound by the terms of the price quotation, but reserved the right to change the price up to the time of shipment. It is difficult to say with certainty what the legal consequences would be if Sunroc had merely accepted the price quotation because the terms of the resulting "contract" would be indefinite. In *Quaker State Mushroom*, the price quotation provided: "Prices are subject to change without notice. All orders are subject to final confirmation of this office." 635 F.Supp. at 1282. The court found this document to be a quotation rather than an offer, because the buyer's assent would not have consummated the contract. *Id.* at 1284. Finally, a purchase order that follows as a response to a price quotation usually constitutes the offer. *Master Palletizer*, 725 F.Supp. at 1531; *Maurice Electrical*, 632 F.Supp. at 1087. The same could certainly be said for Sunroc's purchase order. However, as I discussed above the price quotation may or may not be the offer. I will leave this question to the jury to decide based upon the document itself and the surrounding circumstances at the time of its issuance.[16]

---

**16.** There is additional evidence that Bergquist did not intend to be bound by the price quotation, although at least for the first transaction Sunroc would not have known of it. The Bergquist invoice, exhibit M10, strongly suggests that Bergquist's usual practice was to take the position that a buyer's purchase order was an offer subject to "approval and acceptance," and that until it was accepted, even prices such

as those on a price quotation were subject to change without notice. The relevant paragraphs provide:

4. DELIVERIES. ... Date of shipment shown on our quotation form or promised at any time during the life of the order is based on the seller's best judgment at that time but may be subject to changing conditions, in

## VIII. Question 5: Conditional Acceptance

After reading *Step–Saver*, Sunroc abandoned its contention that its purchase order was a conditional acceptance. Bergquist does not argue, nor could it given the conditional acceptance rule pronounced in *Step–Saver*, that its invoice was a conditional acceptance. Neither Sunroc's purchase order nor Bergquist's invoice was a conditional acceptance or a counter-offer.

## IX. Question 6: Did the Parties Enter into a Series of Oral Agreements?

■ At the preliminary injunction hearing, I found Bergquist had failed to prove by clear and convincing evidence the existence of an oral contract with Sunroc. I based my decision upon the fact none of the participants in the telephone conversations (McShane, Joyce, Scheiber, or Henton–Olsen) remembered any of the significant details of those conversations and the fact that Joyce provided Bergquist with a purchase order number. These individuals remembered little more than that they talked to each other. Joyce and McShane assumed their conversations with Bergquist followed their usual pattern of placing orders with vendors. Scheiber did not remember the particulars of any conversation with Sunroc except for the last transaction where he and Joyce dickered over the price and delivery terms. Henton–Olsen did not even remember her conversation with Joyce and merely explained the meaning of her contemporaneous note, which provides little information in any event. The fact that Joyce made a practice of providing Bergquist with Sunroc's purchase order number lent credence to Sunroc's theory that the contract included the purchase order and did not include only the terms discussed over the phone.

To preclude consideration of Sunroc's purchase order, the burden of proof is on Bergquist to show the existence of an oral contract. *Viso v. Werner*, 471 Pa. 42, 369 A.2d 1185, 1187 (1977). Bergquist must establish its existence and terms by clear and precise evidence. *Browne v. Maxfield*, 663 F.Supp. 1193, 1197 (E.D.Pa.1987). Bergquist cannot meet this burden and summary judgment must be awarded to Sunroc on this issue.

The evidence introduced during the preliminary injunction hearing was not clear and convincing of the existence or the terms of an oral contract. The witnesses provided little if any knowledge of either. Their assumptions and beliefs as to how the telephone conversations unfolded are not satisfactory proof. Bergquist now places heavy emphasis on the "confirming" stamp in Sunroc's purchase order. Bergquist argues the stamp must refer to a confirmation of an oral contract. However, that is just one possibility. It also could confirm receipt of the price quotation and the purchase order as a response to it; it could confirm an acceptance, or it could confirm an offer to buy. There is simply no way of knowing which is the case, because no one can remember what happened during the conversation that preceded it.

Bergquist presented additional evidence in the form of Joyce's arbitration testimony, which it argues supports the formation of an oral contract. The arbitration transcript provides:

Q. (by Bergquist's counsel) Was each of your orders for those goods placed, as far as you were concerned, as of the phone call, or was it necessary to send the purchase order thereafter in order to order the goods, to place the order for the goods?

A. (by Joyce) In order to complete the placement? Send a purchase order?

---

many cases beyond the seller's reasonable control. No liability on the seller's part shall result in any case.

6. QUOTATIONS. Stenographical and clerical errors subject to correction. The seller reserves the right to revise any prices quoted by the seller without notice at any time *prior to the acceptance of an order by the seller.* Material price fluctuations are subject to

change in accordance with the price of the material on the day an order *is accepted* by the seller.

10. ACCEPTANCE OF ORDERS. All orders and sales contracts are subject to written *approval and acceptance* by the seller and are not binding until approved or accepted by the seller. (emphasis added)

Q. Did you consider the goods ordered as of the phone call?

A. I considered the order placed but not confirmed.

Q. Okay. Suppose you had never sent the purchase order. Would you still expect to have received the goods? ...

A. As a matter of procedure, I sent a purchase order for the record and just to back me up in the event that the goods don't come.

Placing an order is not the same thing as forming a contract. Placing an order may be nothing more than making an offer to buy. For example, Step–Saver "placed an order" which was "accepted" by TSL on the telephone. *Step–Saver*, at 95–96. The written documents followed the conversation. It appears from the Third Circuit's language that placing an order is something that needs an acceptance in order to blossom into a contract. Thus, the fact that Joyce placed an order, even one that was just a back up, could indicate an offer to buy. Even if placing an order created an oral contract, Bergquist has not shown what the terms of that oral contract were with the requisite modicum of proof. Simply put, Bergquist has not created a genuine issue of material fact as to whether an oral contract existed and, if one did, as to what were its terms. Summary judgment in Sunroc's favor is therefore appropriate as to this issue.

*X. Question 7: Is Bergquist Bound by a Subsequent Agreement to Arbitrate?*

■ The FAA provides: "an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable...." 9 U.S.C. § 2. Sunroc contends Bergquist's attorneys agreed in writing to submit this case to arbitration. Sunroc maintains Bergquist agreed to arbitration after it was notified of Sunroc's demand and only raised an objection after the AAA scheduled the arbitration in Philadelphia as opposed to Minneapolis, where Bergquist is headquartered. To make this argument, Sunroc misuses the writings of Bergquist's counsel's.

Bergquist did not agree to submit this controversy to arbitration. Bergquist adequately preserved its objection to arbitration.

■ As I noted in greater detail, *supra* at p. 1246, Bergquist's counsel stated he did not believe there was an arbitration agreement. This letter was a sufficient objection to cause the AAA to demand a copy of the written arbitration contract. The AAA stated it would withhold further proceedings pending the receipt of the written arbitration contract. Bergquist's counsel's letter dated August 9, 1990, is the strongest evidence in support of Sunroc's position. The letter poses no objections to the arbitration and contains Bergquist's contentions why the arbitration should take place in Minneapolis rather than Philadelphia. However, Bergquist had previously filed its objection to the arbitration. Bergquist did not have to refuse to attend the arbitration and let Sunroc get a default judgment against it. Bergquist could properly proceed with the arbitration mechanics while developing a strategy to prevent arbitration in the end. The letter dated September 18, 1990, from Bergquist's present counsel supports this view. The letter plainly states Bergquist was proceeding with the mechanics of selecting arbitrators in "protest" and despite its "position that this matter is not properly subject to arbitration." Bergquist repeatedly objected to the arbitration. It did not vitiate its objections by participating in the initial phases of the arbitration process. Bergquist had no other choice.

I recognize that at some point it would have been unfair to Sunroc to allow Bergquist to continue in the arbitration process, await an unfavorable decision, and then challenge the arbitration. I need not decide where that point is located. It is clear that Bergquist had not yet reached it. Bergquist went through the motions in "protest" until it was able to formulate and act upon a plan to prevent the arbitration entirely. It sufficiently objected to the arbitration. It did not agree in writing to submit this controversy to arbitration. Bergquist's motion for summary judgment

on this issue will be granted and Sunroc's will be denied.

## XI. Conclusion

In summary, I conclude that

(1) the arbitration provision in question is broad enough to cover Sunroc's products liability, strict liability, and negligence claims, making summary judgment for Sunroc and against Bergquist on Counts Two and Three appropriate;

(2) inclusion of the warranty and damage limitations provisions that appear on Bergquist's invoice would have amounted to material alterations of the parties' basic agreements, making summary judgment for Sunroc and against Bergquist on Count Four appropriate;

(3) neither Sunroc's purchase orders nor Bergquist's invoices could be considered conditional acceptances or counter offers;

(4) the parties did not enter into a series of oral contracts; and

(5) Bergquist did not by subsequent conduct agree to the arbitration of Sunroc's claims.

The two remaining questions, whether arbitration provisions would be material alterations of the parties' basic agreements and whether Bergquist's price quotation was an offer or an invitation to submit offers, are questions for a jury to resolve. Hence summary judgment for either party on Count One is inappropriate.

The practical difficulties in presenting these two questions to a jury are obvious. In effect they deal with differing, conflicting theories of contract law and formation. The resolution of the one may or may not make the resolution of the other unnecessary. I will meet with counsel to discuss how we can best proceed.